**Nos. 22-6177, 22-6199**

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

TIMOTHY SEPI,
Plaintiff-Appellant,
v.
NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,
Defendants-Appellees.

---

WHYTE MONKEE PRODUCTIONS LLC, TIMOTHY SEPI,
Plaintiffs-Appellants,
v.
NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,
Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA,
HON. TIMOTHY D. DEGIUSTI
NO. 5:20-CV-00933-D

---

## BRIEF OF APPELLEES NETFLIX, INC. AND
## ROYAL GOODE PRODUCTIONS LLC

---

**[ORAL ARGUMENT NOT REQUESTED]**

Robert H. Rotstein
Emily F. Evitt
MITCHELL, SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California 90067
Telephone: (310) 312-2000
Email: rxr@msk.com; efe@msk.com

Mack J. Morgan, III
MJMLAW PLLC
6618 N. Hillcrest Ave.
Nichols Hills, Oklahoma 73116
Telephone: (405) 343-7454
Email: mack@mjmlaw.biz

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES...................................................................... ix

INTRODUCTION.................................................................................................... 1

COUNTERSTATEMENT OF ISSUES ................................................................. 3

STATEMENT OF THE CASE ............................................................................... 4

    A.    Factual and Procedural Background ....................................................... 4

    B.    Procedural History.................................................................................. 7

STANDARD OF REVIEW .................................................................................... 9

SUMMARY OF ARGUMENT.............................................................................. 10

ARGUMENT .......................................................................................................... 11

II.    **The District Court Did Not Abuse Its Discretion by Awarding Attorney's Fees to Defendants**.................................................................... 11

    A.    Plaintiffs Concede the District Court Was Within Its Discretion to Find Improper Motivation, a Factor Meriting Significant Weight .... 15

    B.    The Court Properly Found That Plaintiffs' Claims Were Objectively Unreasonable ................................................................... 18

    C.    Plaintiffs Arguments Regarding Frivolousness and Deterrence, and So-Called "Additional" Factors, Are Meritless........................... 22

    D.    Plaintiffs' Alternative Balancing of the *Fogerty* Factors Cannot Show an Abuse of Discretion........................................................... 26

III.    **The District Court Did Not Abuse Its Discretion by Awarding Costs for Plaintiffs' Video Deposition** ................................................................ 27

    A.    The 2008 Amendment to 28 U.S.C. § 1920(2) Explicitly Authorizes Taxation of Costs for Video Depositions ......................... 28

## TABLE OF CONTENTS
(continued)

**Page**

B.    The Court Did Not Abuse Its Discretion by Finding the Video Deposition Costs to Have Been Reasonably Necessary ..................... 30

**CONCLUSION**.............................................................................................. 33

**CERTIFICATE OF COMPLIANCE** ............................................... 35

**ATTACHMENT**

Order Granting Defendants' Motion for Summary Judgment ..................... 36

**CERTIFICATE OF SERVICE** ........................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alcorn v. City of Chicago*,
336 F.R.D. 440 (N.D. Ill. 2020)................................................................32

*Baker v. Urban Outfitters, Inc.*,
431 F. Supp. 2d 351 (S.D.N.Y. 2006) ......................................................16, 24

*Becker v. Kroll*,
494 F.3d 904 (10th Cir. 2007) ..................................................................30

*Bell v. Eagle Mountain Saginaw Indep. School Dist.*,
27 F.4th 313 (5th Cir. 2022*)* ...................................................................12, 24

*Browder v. City of Moab*,
427 F.3d 717 (10th Cir. 2005) ..................................................................13

*Budget Cinema v. Watertower Assocs.*,
81 F.3d 729 (7th Cir. 1996)......................................................................15, 17

*BWP Media USA Inc. v. Rich Kids Clothing Co., LLC*,
103 F. Supp. 3d 1242 (W.D. Wash. 2015) ................................................24

*Campbell v. Acuff-Rose Music, Inc.*,
510 US 569 (1994).....................................................................................20

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989)...................................................................................19

*Colwell v. Eleven Creative Servs.*,
2020 WL 417573 (D. Colo. Jan. 26, 2020) ...............................................23

*Eagle Serv's Corp. v. H20 Indus. Serv's, Inc.*,
532 F.3d 620 (7th Cir. 2008) ....................................................................12

*Endo Pharms. Inc. v. Amneal Pharms., LLC*,
331 F.R.D. 575 (S.D.N.Y. 2019)...............................................................29

*Energy Intel. Grp., Inc. v. CHS McPherson Refinery, Inc.*,
2019 WL 367788 (D. Kan. Jan. 30, 2019) ................................................23

iv

## TABLE OF AUTHORITIES
<u>(continued)</u>

<u>**Page(s)**</u>

*Entm't. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) ..................................................................14

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994)..................................... 1, 11, 12,15, 22, 23, 25, 26

*Fowler v. California Highway Patrol*,
2014 WL 3965027 (N.D. Cal. Aug. 13, 2014) .......................................29

*Fuentes v. Mega Media Holdings, Inc*,
2012 WL 12931421 (S.D. Fla. Mar. 28, 2012) ......................................24

*Garcia-Goyco v. Law Env't Consultants, Inc.*,
428 F.3d 14 (1st Cir. 2005).....................................................................22

*Google LLC v. Oracle Am., Inc.*,
141 S. Ct. 1183 (2021).............................................................................20

*Gustafson v. Bi-State Dev. Agency of the Missouri-Illinois Metro. Dist.*,
2020 WL 6544236 (E.D. Mo. Nov. 6, 2020)..........................................29

*Harris Mkt. Rsch. v. Marshall Mktg. & Commc'ns, Inc.*,
948 F.2d 1518 (10th Cir. 1991) ..............................................................13

*Horror Inc. v. Miller*,
2022 WL 4473426 (D. Conn. Sept. 26, 2022).......................................16

*Houston v. Norton*,
215 F.3d 1172 (10th Cir. 2000) ..............................................................13

*In re Ricoh Co., Ltd. Pat. Litig.*,
661 F.3d 1361 (Fed. Cir. 2011) ..............................................................29

*In re Williams Sec. Litig–WCG Subclass*,
558 F.3d 1144 (10th Cir. 2009) ..............................................................10

*Kirtsaeng v. John Wiley & Sons, Inc.*,
579 U.S. 197 (2016)...............................................12, 15, 18, 21, 26

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Maljack Prods., Inc. v. GoodTimes Home Video Corp.*,
　81 F.3d 881 (9th Cir. 1996) ...................................................................18

*Marcus v. ABC Signature Studios, Inc.*,
　2017 WL 5592470 (C.D. Cal. Nov. 20, 2017) .......................................21

*Matthews v. Freedman*,
　157 F.3d 25 (1st Cir. 1998) ...................................................................21

*Mifflinburg Tel., Inc. v. Criswell*,
　277 F. Supp. 3d 750 (M.D. Pa. 2017) ....................................................15

*Omega S.A. v. Costco Wholesale Corp.*,
　2012 WL 3150432 (C.D. Cal. June 20, 2012) ........................................23

*Palladium Music, Inc. v. EatSleepMusic, Inc.*,
　398 F.3d 1193 (10th Cir. 2005) ...............................9, 11, 13, 14, 27

*Porto v. Guirgis*,
　659 F. Supp. 2d 597 (S.D.N.Y. 2009) ...............................................19, 21

*Raiser v. San Diego Cnty.*,
　2021 WL 118901 (S.D. Cal. Jan. 13, 2021) ..........................................32

*Robinson v. Lopez*,
　2003 WL 23162906 (C.D. Cal. Nov. 24, 2003) ....................................15

*Ryan v. eXp Realty LLC*,
　2022 WL 475988 (D. Ariz. Feb. 16, 2022) ...........................................32

*Schrock v. Wyeth, Inc.*,
　727 F.3d 1273 (10th Cir. 2013) ........................................................17, 25

*Spear Mktg., Inc. v. Bancorpsouth Bank*,
　2016 WL 193586 (N.D. Tex. Jan. 14, 2016) .........................................16

*Stanley v. Cottrell, Inc.*,
　784 F.3d 454 (8th Cir. 2015) ................................................................28

15366306.2

vi

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*TCA Television Corp. v. McCollum*,
  2017 WL 2418751 (S.D.N.Y. June 5, 2017) ..........................................10, 19, 21

*TCR Sports Broad. Holding, LLP v. Cable Audit Assocs., Inc.*,
  674 F. App'x 805 (10th Cir. 2017) ...........................................................28

*Thoroughbred Software Int'l, Inc. v. Dice Corp.*,
  488 F.3d 352 (6th Cir. 2007) ..................................................................12

*Tilton v. Capital Cities/ABC, Inc.*,
  115 F.3d 1471 (10th Cir. 1997) ....................................................3, 11, 27, 28, 29

*U.S. ex rel. Long v. GSDMIdea City, L.L.C.*,
  807 F.3d 125 (5th Cir. 2015) ..................................................................28

*U.S. v. Leffler*,
  942 F.3d 1192 (10th Cir. 2019) ...............................................................17

*United States v. Ahidley*,
  486 F.3d 1184 (10th Cir. 2007) .................................................................4

*United States v. Halliburton Co.*,
  954 F.3d 307 (D.C. Cir. 2020) ................................................................28

*Webloyalty.com, Inc. v. Consumer Innovations, LLC*,
  388 F. Supp. 2d 435 (D. Del. 2005) ..........................................................24

*Woodhaven Homes & Realty, Inc. v. Hotz*,
  396 F.3d 822 (7th Cir. 2005) ..................................................................12

### STATUTES

17 U.S.C.
  § 107.............................................................................................7
  § 201(b)..........................................................................................7
  §§ 410-411 ......................................................................................17
  § 505.....................................................................................11, 12, 15

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>**Page(s)**</u>

28 U.S.C.
§ 1920..................................................................... 2, 3, 9, 11, 28, 29, 31
§ 1920(2) ....................................................................................3, 11, 28

**RULES**

Federal Rules of Appellate Procedure
Rule 28(a)(6) ...............................................................................4
Rule 30(a)(1) ...............................................................................4

Federal Rules of Civil Procedure
Rule 28 .......................................................................................32
Rule 30 .......................................................................................32

Tenth Circuit Rules
Rule 10.4(C) ...............................................................................4
Rule 28.2(A)(1) ..........................................................................4
Rule 30.1(B)(1) ..........................................................................4
Rule 30.2(A)(1) ..........................................................................4

**OTHER AUTHORITIES**

23 Am. Jur. Trials 95 § 11 (originally published in 1976) ....................................30

E. Figari Jr. & A. Loewinsohn,
Videotaped Depositions Come to Court, *Litigation*, Spring 1988 ....................29

## STATEMENT OF RELATED CASES

Plaintiffs/Appellants in the instant appeals filed a notice of appeal from the district court's rulings on the merits, including the district court's order granting summary judgment to Defendants and entry of judgment in favor of Defendants. *Sepi et al. v. Netflix, Inc., et al.*, Case No. 22-6086 (filed May 26, 2022) (the "Merits Appeal"). The Merits Appeal was fully briefed as of January 30, 2023, and oral argument was heard on March 22, 2023.

**INTRODUCTION**

After granting summary judgment and entering judgment for Defendants Netflix, Inc. and Royal Goode Productions LLC in this manufactured and opportunistic action for copyright infringement, the district court awarded Defendants $35,000 in attorney's fees (reduced from the requested amount of $170,705) and $6,139.85 in costs incurred in defending against Plaintiffs/Appellants' meritless claims over the use of short excerpts of eight videos in Defendants/Appellees' popular documentary series *Tiger King: Murder, Mayhem and Madness* (the "Documentary"). Among other things, the district court held on summary judgment that, as a matter of law, the 2021 deposition testimony of Plaintiff Timothy Sepi was excludable under the sham affidavit doctrine in light of sworn testimony Mr. Sepi had given in 2016 in another matter; that seven of the eight videos purportedly owned by Sepi or co-Plaintiff Whyte Monkee Productions, LLC were works made for hire created in the course of Mr. Sepi's employment at Garold Wayne Zoological Park; and that any use in the Documentary of brief excerpts of the eighth video—comprising unedited footage of funeral proceedings held on Park grounds in 2017 that had been "livestreamed" and posted to YouTube—was clearly transformative and fair use.

In awarding fees, the district court applied the relevant factors set forth in *Fogerty vs. Fantasy, Inc.*, 510 U.S. 517 (1994), and properly concluded that

Plaintiffs' lawsuit was objectively unreasonable and improperly motivated because, among other things, Sepi had given "sham" deposition testimony that contradicted his prior sworn testimony. Separately, Defendants sought to recover $11,484.20 in taxable costs under 28 U.S.C. § 1920, of which the district court ultimately awarded $6,139.85. These included costs of $2,985.00 for electronically recording and preserving Mr. Sepi's two-day video deposition, but excluded other video-related costs associated with the deposition that Defendants sought to recover, such as synchronization fees.

Plaintiff Sepi here appeals the district court's decision to award any attorney's fees at all—he does not appeal the amount awarded—and both Plaintiffs appeal the district court's ruling that the $2,985.00 in costs taxed for the video component of Mr. Sepi's deposition were taxable as reasonably necessary costs for "printed or electronically recorded transcripts." Each issue is to be reviewed by this Court under an abuse of discretion standard. Neither has merit.

*First*, Plaintiffs do not, and cannot, show that the district court abused its discretion in deciding to award some amount of attorney's fees to Defendants. Plaintiffs admit the court "was certainly within its discretion" to conclude Plaintiffs' lawsuit was improperly motivated. Brief ("App.Br.") at 57. That concession alone warrants affirmance.

15366306.2                                    2

*Second*, Plaintiffs' arguments regarding the taxability of video depositions fail to acknowledge that Section 1920 of 28 U.S.C. was amended in 2008 to permit taxation not only for "stenographic" transcripts, but also for "printed and electronically recorded transcripts." *Tilton v. Capital Cities/ABC, Inc.,* 115 F.3d 1471 (10th Cir. 1997), which allowed recovery for costs of video depositions even before that amendment, *a fortiori* remains good law.

The district court's orders awarding fees and costs should be affirmed.

## COUNTERSTATEMENT OF ISSUES

I.      In a copyright action, does a district court act within its discretion by awarding any amount of attorney's fees to prevailing defendants where the factual record supports plaintiffs' claims were objectively unreasonable, the claims were supported by sham testimony, and the losing plaintiff concedes that the district court did not abuse its discretion in finding the litigation was brought with an improper motive?

II.     Where a party takes a plaintiff's deposition via electronically recorded video for the reasonably necessary purpose of later impeachment use at trial, are costs for the video transcript of the deposition taxable under 28 U.S.C. § 1920(2), as amended in 2008, which allows taxation of costs for "printed and electronically recorded transcripts"?

15366306.2                                    3

## STATEMENT OF THE CASE

### A.    Factual and Procedural Background

Defendants' separate response brief submitted in the related Merits Appeal pending before this Court addresses in detail why the district court properly entered summary judgment for Defendants. *See* Appellees' Brief in Case No. 22-6086 (filed December 1, 2022).[1]  The summary below presents the pertinent facts that underlie the instant appeals.[2]

Plaintiff Timothy Sepi began work at the Garold Wayne Interactive Zoological Park or "Garold Wayne Zoo" (the "Park") in 2015. S.App.44-45, 78 (admission of Defendants' Undisputed Material Fact ["UMF"] ¶1); S.App.118 (Order granting Defendants' motion for summary judgment ["MSJ Order"] at 3). The Park was founded by Joe Exotic ("Exotic"), born Joseph Allen Schreibvogel

---

[1] Defendants/Appellees are concurrently requesting that the Court take judicial notice of the parties' briefs in the Merits Appeal and the associated oral argument held on March 22, 2023, at which Plaintiffs raised no challenge to the district court's ruling on seven of the eight videos at issue. *See United States v. Ahidley,* 486 F.3d 1184, 1192 n. 5 (10th Cir. 2007) ("[W]e may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand.").

[2] In addition to Plaintiffs/Appellants' single-volume appendix (denoted by "1.Fee.App.[page]"), Defendants/Appellees also cite herein to their Supplemental Appendix (denoted by "S.App.[page]"), filed concurrently pursuant to 10th Cir. Rule 30.2(A)(1). Defendants submit that the meager background supplied in Plaintiffs' brief and appendix do not comply with Federal Rules of Appellate Procedure and Tenth Circuit Local Rules. *See* Fed. R. App. P. 28(a)(6), 30(a)(1); 10th Cir. R. 10.4(C), 28.2(A)(1), 30.1(B)(1).

and aka Joseph Maldonado-Passage, who had founded the Park some years prior. *Id.* Before Sepi began his job, the Park maintained a studio that was used to produce a web series called *Joe Exotic TV*—a program focusing on Exotic and the Park— including videos that appeared on *Joe Exotic TV* or its YouTube channel. S.App.45, 78 (UMF ¶¶2-3); S.App.118-19 (MSJ Order at 3-4).

In the action below, Sepi contended he was hired by the Park only as a photographer or "cameraman," not to work on videos for Exotic, and that the videos he worked on while employed at the Park were not created as part of his Park employment. *See, e.g.*, S.App.17-18 (Plaintiffs' Second Amended Complaint at 2-3); S.App.130 (MSJ Order at 15). However, Sepi acknowledged under oath that the term "cameraman" or "cameraperson" can refer to someone who takes still pictures, video, or both, and previously in 2016, had given contradictory sworn testimony that his job at the Park was both to make videos and to take still pictures. S.App.46, 52, 79, 81 (UMF ¶¶7, 33); S.App123, 132 (MSJ Order at 8, 17). And while, below, Sepi claimed to have formed Whyte Monkee, back in 2016, he testified that he had played no role in its formation. S.App.51, 80 (UMF ¶31); S.App.123-24, 130 (MSJ Order at 8-9, 15). In Sepi's deposition in this action, when asked to explain the inconsistency between his present testimony and his 2016 testimony, he claimed that he had previously "perjured" himself. 1.Fee.App.181; S.App.52, 81 (UMF ¶33); S.App.130 (MSJ order at 15); *see also* 1.Fee.App.25 at ¶6; 1.Fee.App.68 at ¶7.

In the related Merits Appeal, Plaintiffs changed their story once again. They conceded that Sepi worked as a videographer. *See* Appellees' Request for Judicial Notice; Merits App.Br. at 63 ("For the purposes of this appeal, the Court should assume Mr. Sepi was involved in *both* videography and photography.") (emphasis in original). Plaintiffs also conceded in their merits brief that, contrary to Sepi's testimony below (and consistent with his 2016 testimony), he played no role in forming plaintiff Whyte Monkee. *Id.* ("For the purposes of this appeal, the Court should assume that Mr. Sepi was unaware of WMP at the time of formation, as he originally stated in his 2016 deposition and as Defendants prefer.").

In March 2020, Defendant Netflix, Inc. ("Netflix") released the documentary series *Tiger King: Murder, Mayhem and Madness* (the "Documentary"), which tells the story of Exotic, rival zookeeper Carole Baskin, the Park, and the attendant controversies that ultimately led to Exotic's arrest, criminal prosecution, and trial. S.App.52, 81 (UMF ¶34); *see* S.App.116 (MSJ Order at 1). In creating the Documentary, Defendant Royal Goode Productions LLC ("Royal Goode") licensed the eight videos at issue in this action (the "Videos") from Exotic and from the Park's new owner Jeff Lowe. S.App.52, 81 (UMF ¶35); S.App.121 (MSJ Order at 6).

15366306.2

6

**B.    Procedural History**

### 1.    The Decision on the Merits.

On September 14, 2020, Plaintiffs sued Netflix—and later also Royal Goode—for copyright infringement, contending that they owned the copyrights in the Videos and that Defendants had used clips of those Videos without permission. 1.Fee.App.5, 7; S.App.16. On April 27, 2022, the district court granted Defendants' motion for summary judgment, holding that, as a matter of law, seven Videos were works made for hire under section 201(b) of the Copyright Act, and thus Plaintiffs did not own the copyrights in them. S.App.116, 140 (MSJ Order at 1, 25). The court concluded that Defendants' use of the eighth Video, which was raw footage from a funeral service held at the Park (the "Funeral Video"), in the Documentary was fair use under section 107 of the Copyright Act. S.App.122, 144-45, 148-49 (MSJ Order at 7, 29-30, 33-34). The court also held that, in repudiating Sepi's 2016 sworn testimony, Sepi's 2021's deposition was sham testimony. S.App.130-35 (MSJ Order at 15-20). The same day, the district court entered judgment in favor of Defendants. S.App.150.

### 2.    The Requests for Attorney's Fees and Costs.

On June 1, 2022, Defendants moved in the district court for an award of attorney's fees under the Copyright Act. Defendants sought $170,705.00, which was only a small portion of the fees actually incurred. 1.Fee.App.62, 67, 70-73. On

September 30, 2022, the district court granted Defendants' fees motion in part and denied it in part, holding that although an award of fees was appropriate in the circumstances, a reduced award of $35,000 properly served the objectives of the Copyright Act without "imposing 'an inequitable burden on an impecunious plaintiff'" or "unreasonably deter[ing]" other plaintiffs from pursuing colorable claims. 1.Fee.App.184.

On October 25, 2022, Plaintiff Sepi filed a timely notice of appeal as to "all appealable orders and judgments of [the district court]" including the order on attorney's fees. 1.Fee.App.221 (the "Fees Appeal"). Co-plaintiff Whyte Monkee Productions, LLC did not join this appeal. *Id.*

On June 1, 2022, Defendants also filed a Bill of Costs in the district court, accompanied by a supporting memorandum and declaration. 1.Fee.App.12-44. Defendants sought recovery of $11,484.20 of their costs, including $9,622.30 for costs categorized as "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." 1.Fee.App.12. On November 14, 2014, the district court issued an order holding that Defendants' costs for "obtaining a video deposition" fell within the category of "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case," and that such costs for obtaining Mr. Sepi's video deposition were taxable, but that related fees, such as

synchronization and exhibit-sharing fees for the deposition, were not. 1.Fee.App.229-32.

On November, 14, 2022, Plaintiffs filed an "Amended Notice of Appeal" in the district court as to "all appealable orders and judgments," including the district court's order concerning taxation of costs. 1.Fee.App.235 (the "Costs Appeal").

On November 30, 2022, this Court entered an order consolidating the Fees and Costs Appeals, without reference to the proceedings in the Merits Appeal.

## STANDARD OF REVIEW

The parties agree that the standard of review applying to awards of attorney's fees and costs under the Copyright Act is abuse of discretion. When reviewing awards of attorney's fees for abuse of discretion, "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1200 (10th Cir. 2005) (quoting *McEwen v. City of Norman, Okl.*, 926 F.2d 1539, 1553-54 (10th Cir. 1991)).

When reviewing an award of costs under 28 U.S.C. § 1920, "[a] district court abuses its discretion where it (1) commits legal error, (2) relies on clearly erroneous factual findings, or (3) where no rational basis exists in the evidence to support its

15366306.2                                9

ruling." *In re Williams Sec. Litig–WCG Subclass*, 558 F.3d 1144, 1148 (10th Cir. 2009).

## SUMMARY OF ARGUMENT

I.      The district court acted within its discretion by awarding a highly reduced amount of attorney's fees following Defendants' successful summary judgment motion. Plaintiffs do not challenge that the court was within its discretion to find Plaintiffs acted with an improper motivation in bringing their suit, which alone is a proper basis for awarding fees. Plaintiffs' arguments challenging the district court's conclusion that their suit was objectively unreasonable also fail. The possession of copyright registrations does not make a lawsuit objectively reasonable, and the law as to the work-made-for-hire doctrine, applicable to seven of the eight Videos, was hardly open or unsettled. That some elements of a claim may be satisfied is of no moment: claims are objectively unreasonable if they are "clearly without merit on any determinative issue." *TCA Television Corp. v. McCollum*, 2017 WL 2418751 at *10 (S.D.N.Y. June 5, 2017) (quotation omitted).

Plaintiffs' arguments that this Circuit should mandate "additional" factors, that the district court did not decisively find the action frivolous, or that a fee award would not have strong deterrence value (despite Sepi's sham testimony) are also without merit. Even were they correct, and they are not, they would not show the district court abused its discretion. Indeed, courts have awarded attorney's fees in

15366306.2                                        10

analogous situations when faced with a non-prevailing party's perjury or sham testimony. Finally, Plaintiffs' proffered re-weighing of the *Fogerty* factors does not show that the district court's decision to award fees was a "clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Palladium Music,* 398 F.3d at 1200.

II.     In arguing that the district court erred in awarding costs for the video record of Mr. Sepi's two-day deposition, Plaintiffs misunderstand the history of 28 U.S.C. § 1920 and the Federal Rules. In 1997, this Court held in *Tilton v. Capital Cities/ABC* that costs for videos of a deposition were recoverable under Section 1920. The 2008 amendment to Section 1920(2) specifically permitted taxation for "printed and electronically recorded transcripts," a term that the weight of authority in and out of this Circuit has interpreted to include videos of depositions.

## ARGUMENT

**II.     The District Court Did Not Abuse Its Discretion by Awarding Attorney's Fees to Defendants**

As Plaintiffs concede, "Section 505 of the Copyright Act permits reasonable fees and costs ***at the court's discretion***." [3]  App.Br.15 (emphasis added) (quoting *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1270 n. 11 (10th Cir. 2008)). In determining whether to award fees to a prevailing defendant

---

[3] For ease of reference, Defendants refer to "Plaintiffs" in this section, even though only Sepi appealed the district court's order awarding attorney's fees.

in a copyright infringement case,[4] courts consider "several nonexclusive factors," including "frivolousness, motivation, objective unreasonableness[,] and the need in particular circumstances to advance considerations of compensation and deterrence." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016) (alteration in original) (quoting *Fogerty*, 510 U.S. at 534 n. 19). The Supreme Court instructs that "[t]here is no precise rule or formula for making these determinations." *Fogerty*, 510 U.S. at 534. On the contrary, district courts have "broad leeway" and "wide latitude" to award fees within their "equitable discretion" by application of these factors, and any others deemed appropriate, "based on the totality of [the] circumstances in a case." *Id.*; *Kirtsaeng*, 579 U.S. at 202-03.[5]

---

[4] Plaintiffs do not (and cannot) challenge that Defendants were prevailing parties in the action below for the purpose of 17 U.S.C. § 505.

[5] Several Circuits have held that, in accord with *Fogerty*, awards of fees are "the rule rather than the exception and [they] should be awarded routinely." *Bell v. Eagle Mountain Saginaw Indep. School Dist.,* 27 F.4th 313, 326 (5th Cir. 2022*),* quoting *Virgin Records Am., Inc. v. Thompson,* 512 F.3d 724, 726 (5th Cir. 2008); *see also, e.g., Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 362 (6th Cir. 2007) ("attorney's fees … are awarded routinely"); *Woodhaven Homes & Realty, Inc. v. Hotz*, 396 F.3d 822, 824 (7th Cir. 2005) ("When the prevailing party is the defendant … the presumption in favor of awarding fees is very strong. For without the prospect of such an award, the party might be forced into a nuisance settlement or deterred all together from exercising his rights.") (citation omitted); *Eagle Serv's Corp. v. H20 Indus. Serv's, Inc.*, 532 F.3d 620, 624 (7th Cir. 2008) ("when the prevailing party is the defendant … the presumption in favor of awarding fees is very strong.") (citation omitted).

15366306.2

12

An award of attorney's fees is "generally reviewed for an abuse of discretion." *Browder v. City of Moab*, 427 F.3d 717, 719 (10th Cir. 2005) (citation omitted); *Harris Mkt. Rsch. v. Marshall Mktg. & Commc'ns, Inc.*, 948 F.2d 1518, 1527 (10th Cir. 1991); *see Palladium Music,* 398 F.3d at 1200 (citing *Fogerty*, 510 U.S. at 524 n. 11). As this Court has stressed, "[a]n appellate court plays a 'limited role' in reviewing a district court's award of attorneys' fees and costs, and deference is given to a district court's judgment on the matter, since the court is in a better position to assess the course of litigation and quality of work." *Harris,* 948 F.2d at 1527 (quoting *Duran v. Carruthers,* 885 F.2d 1492, 1494 (10th Cir. 1989)).

The abuse of discretion standard applies equally to the decision of whether to award attorney's fees at all and to the amount awarded. *Houston v. Norton*, 215 F.3d 1172, 1174 (10th Cir. 2000). When reviewing for potential abuse of discretion, the appellate court reviews *de novo* whether the district court applied the correct legal standard, but the district court's factual findings are reviewed for clear error. *Browder*, 427 F.3d at 719. Under this standard, "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Palladium Music,* 398 F.3d at 1200 (quoting *McEwen,* 926 F.2d at 1553–54).

15366306.2                                            13

The sole issue before the Court concerning the district court's order on attorney's fees is Plaintiffs' contention that the district court abused its discretion by awarding *any* fees at all, even at the greatly reduced amount of $35,000. *See* App.Br.14 ("This appeal does not challenge the amount of fees awarded beyond challenging the threshold question of whether fees should have been awarded at all."). By disclaiming any challenge beyond this "threshold" question, Plaintiffs have waived any appeal as to the amount of fees awarded, or whether fewer than all of Plaintiffs' infringement claims were deserving of a fee award.[6]

For the reasons addressed below, the district court clearly acted within "the bounds of permissible choice," *Palladium Music*, 398 F.3d at 1200, when it decided that *all* of Plaintiffs' claims merited a discretionary award of fees, under multiple factors, and that a reasonable award under the circumstances was $35,000. Yet because any challenge to the amount of the award has been waived, the Court need not take up whether the district court was correct to reach this precise conclusion. The district court's order must be affirmed as long as there was no abuse of discretion in finding that *any* of Plaintiffs' infringement claims merited any fee award at all— even a single dollar.

---

[6] *See, e.g., Entm't. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1230 (9th Cir. 1997) (awards of fees in a copyright case may be appropriate for certain claims, even if not all, where claims are "based on different facts and legal theories") (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434–35 (1983)).

15366306.2                                        14

### A.    Plaintiffs Concede the District Court Was Within Its Discretion to Find Improper Motivation, a Factor Meriting Significant Weight

Plaintiffs concede the district court "certainly" did not abuse its discretion by finding the factor of improper motivation weighed in favor of fees. *See* App.Br. 57 ("Plaintiff does not challenge the Court's finding that the motivation factor weighs in favor of fees. After all, the District Court was certainly within its discretion to draw the conclusions that it did regarding this factor."). This alone in dispositive: even a single *Fogerty* factor may support an award of fees. In particular, "a court may order fee-shifting ***because of a party's litigation misconduct***, whatever the reasonableness of his claims or defenses." *Kirtsaeng*, 579 U.S. at 209 (emphasis added).[7]  *See also Robinson v. Lopez*, 2003 WL 23162906, at *2 (C.D. Cal. Nov. 24, 2003) ("Courts have awarded costs [*i.e.*, the attorney's fees component of costs under 17 U.S.C. § 505] for copyright claims based on a single factor, such as objective unreasonableness.") (citing *Williams v. Crichton*, 891 F. Supp. 120 (S.D.N.Y. 1994); *Budget Cinema v. Watertower Assocs.*, 81 F.3d 729 (7th Cir. 1996)).

---

[7] A sham affidavit or testimony is itself a form of litigation misconduct, and falls directly under *Kirtsaeng*. Awarding fees in such cases is consistent with non-copyright cases that similarly hold sham affidavits to permit an award of fees. *See, e.g., Mifflinburg Tel., Inc. v. Criswell,* 277 F. Supp. 3d 750, 807-08 (M.D. Pa. 2017) (awarding to prevailing party entirety of requested amount of $178,679.29 based on submission of sham affidavit on summary judgment).

Plaintiffs attempt to circumvent the implications of their concession by arguing, without legal support, that an improper motivation in bringing suit should here be given little weight. But this defies logic, and is actually the opposite of what the cases instruct. *See Baker v. Urban Outfitters, Inc.,* 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x 845 (2d Cir. 2007) (awarding fees: "[T]he presence of improper motivation in bringing a lawsuit or other bad faith conduct weighs heavily in favor of an award of costs and fees."); *Spear Mktg., Inc. v. Bancorpsouth Bank*, 2016 WL 193586, at *6-8 (N.D. Tex. Jan. 14, 2016) (awarding fees and quoting *Baker* for this principle), *aff'd*, 844 F.3d 464 (5th Cir. 2016); *Horror Inc. v. Miller*, 2022 WL 4473426, at *4 (D. Conn. Sept. 26, 2022) (awarding fees and also quoting *Baker*, noting that improper motive may be demonstrated by "[t]he filing of the lawsuit, a party's conduct during the litigation, or both").

Nor can Plaintiffs point to alleged mitigating factors such as that Sepi had a role in making the Videos, or that Plaintiffs registered the Videos with the Copyright Office. App.Br. 57-58. As the district court found, Sepi concocted sham testimony in an attempt to avoid the obvious fact that seven of the eight Videos were created within the scope of his employment and did not belong to him. 1.Fee.App.181. It also found Sepi's actions before he filed this lawsuit to be inconsistent with Plaintiffs' claim of ownership. *Id*. Such facts make this anything but a "textbook copyright dispute" involving a "registered copyright holder," as Plaintiffs

disingenuously seek to frame it. App.Br.60. A copyright registration may be *prima facie* evidence of ownership, but it is a rebuttable one, and courts routinely award fees against plaintiffs who hold copyright registrations. Indeed, an award of fees is especially appropriate where, as here, registrations were procured through material misrepresentations or omissions to the Copyright Office. *Budget Cinema*, 81 F.3d at 732-33. Moreover, registration is a *precondition* for filing a copyright infringement suit. *See* 17 U.S.C. §§ 410-411. If copyright registrations militated against fee awards, no defendant could ever recover fees.

Plaintiffs argue for the first time on appeal that a "careful review" of Sepi's 2021 deposition testimony shows that, at the time of his September 2016 deposition, Sepi "feared for his safety and well-being while living at the Tiger King park," and that this supports giving lesser weight to a finding of improper motive. App.Br.58. Plaintiffs put none of this allegedly relevant testimony into their appendix; nor was the argument made in their opposition below. *See* 1.Fee.App.128-53. The argument thus was waived, or at minimum was forfeited and is reviewable only under a "rigorous" plain-error standard, which it cannot meet. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013) (citing *Quigley v. Rosenthal*, 327 F.3d 1044, 1069 (10th Cir. 2003)); *see also U.S. v. Leffler,* 942 F.3d 1192, 1196 (10th Cir. 2019) (citing *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011)).

Even if not waived, this new argument is inconsistent with the facts, and does not alter the conclusion that the court's finding of improper motivation was within its discretion and merited substantial weight. When deposed in September 2016, Mr. Sepi had ***already quit his job at the Park***, and was no longer living there. *See* S.App.51, 80 (UMF ¶¶30-31, undisputed by Plaintiffs); *see also* S.App.121, 123 (MSJ Order at 6, 8). Sepi's claims of fear are also implausible: his 2016 testimony *harmed* Joe Exotic's interests. S.App.134 (MSJ Order at 19 n. 6) (finding Sepi's "explanation makes no sense," since if anything, his 2016 testimony concerning the Whyte Monkee entity "hurt Exotic's interests"). Plaintiffs' improper motivation alone supports affirmance of the district court's fees award.

**B.    The Court Properly Found That Plaintiffs' Claims Were Objectively Unreasonable**

While it is not necessary for the Court to go beyond Plaintiffs' improper motivation, the record also confirms that the district court did not abuse its discretion in finding Plaintiffs' claims to have been objectively unreasonable, a factor Plaintiffs concede—and even stress—should be given "substantial weight." App.Br.42-43 (quoting *Kirtsaeng*, 579 U.S. at 199-200). As held in *Kirtsaeng*, "[a] district court that has ruled on the merits of a copyright case can easily assess whether the losing party advanced an unreasonable claim or defense." *Id.* at 207. This is assessed under an objective standard, and cannot be negated by a plaintiff claiming ignorance of the facts or of the law prior to filing. *See Maljack Prods., Inc. v. GoodTimes Home Video*

15366306.2                              18

*Corp.*, 81 F.3d 881, 889 (9th Cir. 1996); *Porto v. Guirgis*, 659 F. Supp. 2d 597, 617 (S.D.N.Y. 2009) (a claim of copyright infringement is objectively unreasonable if it is "clearly without merit or otherwise patently devoid of a legal or factual basis") (quotation omitted); *TCA Television*, 2017 WL 2418751 at *10 (claim is objectively unreasonable if "clearly without merit on *any* determinative issue") (citation omitted and emphasis added).

The district court found that "Plaintiffs' reliance on sham testimony indicates that their claim was lacking in factual support and objectively unreasonable," and that as to the Funeral Video—which it dismissed on fair use grounds—that Plaintiffs' claim "also was lacking in factual and legal support," and had been addressed by Plaintiffs "in only the most perfunctory manner." 1.Fee.App.181-82. None of Plaintiffs' arguments against the district court's findings on this factor have merit.

### 1. Plaintiffs' Copyright Registrations and the Legal Issues Involved Did Not Make Their Claims Reasonable.

Plaintiffs attempt to argue that their claims were not objectively unreasonable because they held copyright registrations and because issues of law addressed on summary judgment were purportedly "open" or "unsettled." App.Br.46, 48. But, as noted, to file an infringement action, copyright plaintiffs *must* secure copyright registrations, which are fully rebuttable as to both ownership and validity. Moreover, the Supreme Court's pronouncements on the work-for-hire doctrine, as in

15366306.2                                    19

*Community for Creative Non-Violence v. Reid,* 490 U.S. 730 (1989), are hardly unsettled. Plaintiffs' repeated claims of a lack of "Tenth Circuit authority," or of an "apparent absence of binding authority"—or that the issues presented were "novel" or "colorable," or the claims "not unreasonable" (*see* App.Br.40, 45-46, 49)—are thus entirely disingenuous. Supreme Court authority *is* law in the Tenth Circuit.[8] On the work-for-hire doctrine, the district court found wide agreement in cases both within and without the Tenth Circuit, noting that the legal outcome was clear even if Sepi's sham testimony were to be credited. S.App.137-38 (MSJ Order at 22-23). Finally and tellingly, in the Merits Appeal, Plaintiffs abandoned their claims made below concerning Sepi's employment, and did not even address the seven work-for-hire Videos at oral argument. *See* Appellees' Request for Judicial Notice.

### 2. Lack of Merit on *Any* Determinative Issue Renders a Copyright Claim Objectively Unreasonable.

Plaintiffs also argue that their claims were not objectively unreasonable because they satisfied certain elements, such as the requirement of originality and some amount of actual use of the Videos. App.Br.47. That illogical assertion is

---

[8] Plaintiffs also argue that determinations of fair use can be "notoriously difficult to predict." App.Br.50. But there is little that is unsettled or unpredictable as to the brief documentary uses Plaintiffs alleged to be non-fair. *See Campbell v. Acuff-Rose Music, Inc.,* 510 US 569 (1994); *Google LLC v. Oracle Am., Inc.,* 141 S. Ct. 1183 (2021); *see also* 1.Fee.App.182 (finding that as to the Funeral Video, "all of the fair use factors tipped decidedly in Defendants' favor"). Although the pending *Warhol* case focuses on the exact scope of transformative use, the result here will be the same no matter what the Supreme Court decides.

15366306.2                                    20

contradicted by the very cases Plaintiffs cite, such as *Porto*. As noted above, a case that is "clearly without merit," for any reason, or that fails on "any determinative issue," is objectively unreasonable, subjecting the plaintiff to an award of fees. *Porto*, 659 F. Supp. 2d at 617; *TCA Television*, 2017 WL 2418751 at *10, *see Marcus v. ABC Signature Studios, Inc.*, 2017 WL 5592470, at *3 (C.D. Cal. Nov. 20, 2017) ("Plaintiff's refusal to dismiss his case after receiving clear evidence negating one of the elements of his copyright claim shows that Plaintiff's claims were objectively unreasonable.").

Plaintiffs can point to no actual errors of law or fact in the district court's determination their claims were objectively unreasonable. Notably, they do not engage with the district court's findings as to Mr. Sepi's sham testimony at all, attempting to disguise this as simply a hard-fought "issue of ownership," and even claim that Sepi's "positions…were far from unreasonable." App.Br.48. But as the district court noted, Mr. Sepi's resort to sham testimony demonstrated that Plaintiffs' claims were not reasonable. This applies with equal or greater force to objective unreasonableness as it does to improper motivation, where Plaintiffs admit the court's findings were "certainly within its discretion."[9]

---

[9] The *Kirtsaeng* court warned that even if a party's claims ***are*** found objectively reasonable (which Plaintiffs' clearly were not), this does not raise a presumption against the award of fees. 579 U.S. at 209-10. Even were Plaintiffs' arguments somehow correct, an award of fees would thus still be within the court's discretion because of factors including Sepi's sham testimony. *See also Matthews v. Freedman,*

15366306.2                                    21

### C.    Plaintiffs Arguments Regarding Frivolousness and Deterrence, and So-Called "Additional" Factors, Are Meritless

Plaintiffs stress that the district court did not expressly find their action was frivolous, quibble with the district court's findings as to the value of a fee award for purposes of deterrence, and urge the Tenth Circuit to mandate and retroactively apply "additional" factors that Plaintiffs never raised in their opposition below, and whose imposition would be at odds with *Fogerty*'s instruction that the factors to be applied by a district court are non-exclusive and discretionary. As to all of these issues, the answer is the same: even accepting Plaintiffs' arguments, they cannot change the conclusion that the district court was within its discretion to award fees.

First, the district court was not required to find that Plaintiffs' claims were frivolous in order to award attorney's fees. *See Fogerty*, 510 U.S. at 532 n. 18 (rejecting argument that attorney's fees award to a defendant "represents a penalty imposed upon the plaintiff for institution of a baseless, frivolous, or unreasonable suit, or one instituted in bad faith"); *Garcia-Goyco v. Law Env't Consultants, Inc.*, 428 F.3d 14, 20-21 (1st Cir. 2005) (fee award appropriate even without express finding of frivolity). Even assuming the district court had found none of Plaintiffs' claims frivolous, which it very clearly did not, an award of fees would still be proper.

---

157 F.3d 25, 29 (1st Cir. 1998) ("Depending on other circumstances, a district court could conclude that the losing party should pay even if all of the arguments it made were reasonable.").

Second, while Plaintiffs argue that "it's clear that none of Plaintiffs' copyright claims were frivolous as none involved fantastic or delusional scenarios,"[10] App.Br.52, the district court determined only that Plaintiffs' claims were not frivolous as to one of eight Videos (the Funeral Video). 1.Fee.App.180-81. Plaintiff asserted ownership of the other seven Videos based on sham testimony—clearly frivolous claims.

Plaintiffs next assert that "[t]his case presents no particular circumstances necessitating deterrence." App.Br.64. Yet Plaintiffs **concede** the district court was well within its discretion to find the case improperly motivated, and the district court's order repeatedly stressed Plaintiffs' "reliance on sham testimony." 1.Fee.App.181-82. The necessity for deterrence could hardly be clearer. *See Omega S.A. v. Costco Wholesale Corp.,* 2012 WL 3150432, at *1 (C.D. Cal. June 20, 2012), *aff'd,* 776 F.3d 692 (9th Cir. 2015) (where lawsuit was improperly motivated, award of fees served to "encourage future defendants to resist improperly-motivated

---

[10] Notably, other courts in and out of this Circuit have not applied so restrictive a standard. *See, e.g., Colwell v. Eleven Creative Servs.,* 2020 WL 417573, at *2 (D. Colo. Jan. 26, 2020) ("[A] frivolous claim under the Copyright Act is one that, in either the factual or legal assertions, is clearly baseless.") (quoting *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 2017 U.S. Dist. LEXIS 222099, at *20, 2017 WL 8236267 (C.D. Cal. Dec. 5, 2017)); *Energy Intel. Grp., Inc. v. CHS McPherson Refinery, Inc.,* 2019 WL 367788, at *7 (D. Kan. Jan. 30, 2019) (discussing *Fogerty* factors: "A claim is frivolous when it 'lacks an arguable basis either in law or in fact.'") (citing *Twentieth Century Fox Film Corp. v. Streeter*, 438 F. Supp. 2d 1065, 1074 (D. Ariz. 2006), in turn quoting *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)).

15366306.2                                           23

infringement actions, and would deter the filing of such actions") (citing *Fogerty,*

510 U.S. at 527); *BWP Media USA Inc. v. Rich Kids Clothing Co., LLC*, 103 F. Supp.

3d 1242, 1248-49 (W.D. Wash. 2015) (fee award served "to compensate a successful

copyright defense and deter future improper conduct"); *Baker,* 431 F. Supp. 2d at

360 ("An award of fees and costs is necessary to convince [plaintiff] and other like-

minded plaintiffs that federal courts do not exist so that they can roll the dice on

unreasonable allegations or so that they can seek fame and fortune from 'deep-

pocketed' defendants.").[11]

Finally, Plaintiffs urge this Court to consider to "additional" factors beyond

the four standard *Fogerty* factors—a "purposes of the Copyright Act" factor and a

"chilling effects" factor—claiming there is an "open question of law as to whether

this Circuit accepts or rejects" them. App.Br.28. This argument was never raised

---

[11] Plaintiffs' attempt to distinguish *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313 (5th Cir. 2022), is unavailing. While Plaintiffs argue *Bell* involved a "serial litigant" with a "long history" of bringing claims worthy of being deterred, App.Br.61-62, the opinion nowhere restricts its logic to apply only to serial litigants. *See* 27 F.4th at 326. In other cases, courts analyzing the deterrence factor have held that conduct involving "sham" or false testimony strongly weighs in favor of an award of fees. *See, e.g., Fuentes v. Mega Media Holdings, Inc*, 2012 WL 12931421, at *5 (S.D. Fla. Mar. 28, 2012) (factor favored award of fees because "the Copyright Act was not meant to encourage people to manufacture infringement claims or perjure themselves in attempting to create non-existent actual damages"); *Webloyalty.com, Inc. v. Consumer Innovations, LLC*, 388 F. Supp. 2d 435, 443-44 (D. Del. 2005) (award of attorney's fees to prevailing party was "strongly supported" by "blameworthiness" of non-prevailing party and "the need to deter conduct that borders on or constitutes perjury").

below and was waived. *Schrock*, 727 F.3d at 1284. Beyond this, a district court's choice not to consider "additional" *Fogerty* factors whose applicability is an "open question" could hardly amount to legal error mandating remand or reversal, let alone when the Supreme Court instructs that even the original *Fogerty* factors are intended to guide district courts, and that fee decisions are to be left to the court's "equitable discretion."[12]

In any case, the district court *did* carefully consider these factors as part of its analysis of whether an award of fees was merited, and if so, in what amount. The court noted the duty to "remain 'faithful to the purposes of the Copyright Act,'" 1.Fee.App.180 (quoting *Fogerty*, 510 U.S. at 534, n. 19), that reduction of the fee award was "consistent with the objectives of the Copyright Act," 1.Fee.App.184, and that an award in the reduced amount would "ensure[] that plaintiffs who sue for copyright infringement … will not be unreasonably deterred from asserting colorable claims to protect their original works." *Id.*[13] It also noted that courts

---

[12] The out-of-circuit cases Plaintiffs cite do not mandate express consideration of these other factors. *See, e.g.*, App.Br.30 (instruction to consider "factors *such as* [...] the purposes of the Copyright Act.") (quoting *Killer Joe Nev., LLC v. Does 1-20*, 807 F.3d 908, 911 (8th Cir. 2015)) (emphasis added); App.Br.32 (citing *Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033, 1037 (9th Cir. 2018)) (noting additional factors "may be considered").

[13] Plaintiffs claim this demonstrates the district court considered a "chilling effects" factor only for the amount of fees, but not for "the threshold issue of *whether* to award Copyright fees at all." App.Br.32 n. 3 (emphasis in original). But this is illogical: the district court's finding that a reduced award of $35,000 would not

"may . . . consider 'whether the chilling effect of attorney's fees may be too great or impose an inequitable burden on an impecunious plaintiff.'" 1.Fee.App.183 (quoting *Karmo v. Morgan Creek Ent. Grp.*, 2019 WL 13095278, at \*4 (C.D. Cal. June 28, 2019)). The court thus considered "additional" factors of the purposes of the Copyright Act and of potential "chilling effects," and found an award of fees still merited.

## D.    Plaintiffs' Alternative Balancing of the *Fogerty* Factors Cannot Show an Abuse of Discretion

Since there is no "rule" or "formula" dictating how a court must apply the *Fogerty* factors, an attempt to recalibrate how a district court ***might*** have re-weighted certain factors when other factors already support a fee award cannot show an abuse of discretion. But this is precisely what Plaintiffs attempt to do, offering their preferred calculation of how the district court might have analyzed matters differently and arrived at a different result. App.Br.66-67. As noted above, however, even a single factor may be sufficient for an award of fees depending on the circumstances of the case, and courts have wide latitude to award fees in exercise of their equitable discretion. *See Kirtsaeng*, 579 U.S. at 202-03, 209.

Here, the district court—which according to the Supreme Court in *Kirtsaeng*, is best situated to understand the reasonableness of the parties—concluded that

___

"unreasonably deter[]" plaintiffs with colorable claims *is* a finding that some award of fees was still merited.

15366306.2                                    26

Sepi's 2021 two-day long deposition testimony, used by Plaintiffs in an attempt to avoid summary judgment, was essentially a sham affidavit. Plaintiffs' preferred re-weighing of the factors—where only "improper motivation" weighs in favor in favor an award, but where other factors have been manipulated to come out neutral or in their favor, based on arguments that are tenuous both legally and factually—does not show the district court's decision to award fees was an abuse of discretion. Indeed, even if all of Plaintiffs' arguments were credited, they still fail to show that under the circumstances, the district court abused its discretion by awarding Defendants some portion of their fees—*i.e.*, that the district court made a "clear error of judgment" or "exceeded the bounds of permissible choice in the circumstances." *Palladium Music*, 398 F.3d at 1200.

The award of attorney's fees should be affirmed.

## III.  The District Court Did Not Abuse Its Discretion by Awarding Costs for Plaintiffs' Video Deposition

Plaintiffs' appeal of the $2,985.00 award of Defendants' costs for recording and preserving the video record of Plaintiffs' two-day deposition also lacks merit. Plaintiffs assert: (1) The controlling case, *Tilton*, 115 F.3d 1471, relies on a principle of "implicit authorization" of taxable costs that is "no longer good law" (App.Br.19, 20-24); and (2) Defendants' video-related costs were not "necessary," such that the district court therefore abused its discretion, because Defendants could have taken and preserved Mr. Sepi's video deposition themselves "for free" (App.Br.25-26).

15366306.2                                   27

**A.     The 2008 Amendment to 28 U.S.C. § 1920(2) Explicitly Authorizes Taxation of Costs for Video Depositions**

In its current form, Section 1920(2) permits taxation of "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." 28 U.S.C. §1920(2); *see also TCR Sports Broad. Holding, LLP v. Cable Audit Assocs., Inc.,* 674 F. App'x 805, 809 (10th Cir. 2017). Nowhere mentioned in Plaintiffs' brief is the fact that at the time of the *Tilton* case, in 1997, the language of Section 1920 was far narrower, permitting taxation only for "[f]ees of the court reporter for all or any part of the stenographic transcript" (language *Tilton* directly quotes). 115 F.3d at 1473. *Tilton* nonetheless held that the then-applicable version Section 1920(2) "implicitly permit[ted]" taxation of video-recorded depositions when read in connection with the Federal Rules of Civil Procedure. *Id.* at 1477.

Only in 2008 was Section 1920(2) amended to take its present form. It follows *a fortiori* that the 2008 amendment confirms rather than repudiates *Tilton*'s holding. *See U.S. ex rel. Long v. GSDMIdea City, L.L.C*., 807 F.3d 125, 130-31 (5th Cir. 2015) (explaining 2008 amendment: "The phrase 'electronically recorded transcripts' includes video transcripts of depositions"); *United States v. Halliburton Co*., 954 F.3d 307, 313 (D.C. Cir. 2020) (awarding costs for video deposition, quoting *U.S. ex rel. Long*); *Stanley v. Cottrell, Inc.,* 784 F.3d 454, 466-67 (8th Cir. 2015) (holding that when justified by circumstances, "both printed and electronic transcripts of the same deposition," including video recordings, "are 'necessarily

15366306.2                                    28

obtained for use in the case,' thus satisfying the core requirement of the statute"); *In re Ricoh Co., Ltd. Pat. Litig.*, 661 F.3d 1361, 1370 (Fed. Cir. 2011) (noting that "there is no indication in the text or history of [the 2008] amendment that Congress intended to overrule" pre-2008 decisions such as *Tilton*, and that "[c]onsistent with the Sixth and Tenth Circuits, we think that the correct interpretation of section 1920 is that the costs constitute taxable costs").[14]

Equally misguided is Plaintiffs' attempt to shoehorn their argument into recent jurisprudence regarding the "ordinary meaning" of terms found in cost-recovery statutes. App.Br.19, 22-23. Plaintiffs cite a dictionary definition of "transcript" and claim—without evidence—that "[n]o one would ever refer to a video as a transcript." App.Br.23. But as noted above, that is exactly what courts and legal practitioners do, at least in the context of depositions, and they did so even before the 2008 amendments. *See also* E. Figari Jr. & A. Loewinsohn, Videotaped

---

[14] *See also, e.g., Endo Pharms. Inc. v. Amneal Pharms., LLC*, 331 F.R.D. 575, 583 (S.D.N.Y. 2019) ("In this District, '[v]ideo fees have been deemed taxable where there was an expectation among the parties that the video of the testimony might be presented at trial.'") (quoting *In re Omeprazole*, 2012 WL 5427791, at *4 (S.D.N.Y. Nov. 7, 2012) (some internal quotation marks omitted); *Fowler v. California Highway Patrol*, 2014 WL 3965027, at *5 (N.D. Cal. Aug. 13, 2014) "([B]oth the videotaped depositions and stenographic transcripts in this case are properly taxable.") (citing *In re Recoh*, 661 F.3d at 1369); *Gustafson v. Bi-State Dev. Agency of the Missouri-Illinois Metro. Dist.*, 2020 WL 6544236, at *2 (E.D. Mo. Nov. 6, 2020) (after award of summary judgment to defendants, finding "both stenographic and video transcripts of Plaintiff's deposition … 'necessarily obtained for use in the case,'" and hence taxable under Section 1920, where video transcript had been obtained for purposes of impeachment).

Depositions Come to Court, *Litigation*, Spring 1988, at 35-36 (explaining that at trial, a "videotaped deposition … may be preferable" for a friendly witness, because "the resulting video transcript" can be used at trial if the testimony was successful and the witness is out of subpoena range); 23 Am. Jur. Trials 95 § 11 (originally published in 1976) ("Having the video transcript of an early deposition examination of a witness provides a record not only of important substantive testimony but of the manner in which the witness testifies….").

The Court did not abuse its discretion by finding that costs for creation of a video transcript of Mr. Sepi's deposition could be taxed as costs for "printed and electronically recorded transcripts."

B.   **The Court Did Not Abuse Its Discretion by Finding the Video Deposition Costs to Have Been Reasonably Necessary**

On appeal, Plaintiffs do not dispute Defendants' argument below, accepted by the district court, that a video-recorded version of Mr. Sepi's deposition was reasonably necessary for use at a potential trial, including for purposes of impeachment. 1.Fee.App.230. Any such argument has thus been waived. *Becker v. Kroll,* 494 F.3d 904, 913 n. 6 (10th Cir. 2007). Nor do they challenge that taxable costs may include costs incurred in preparation for a trial that does not ultimately occur. Instead, they argue that the $2,985.00 taxed for the video portion of Mr. Sepi's deposition was "clear error" because Defendants' use of Veritext, a third-party court reporting service, to record and preserve the video transcript was not "necessary,"

15366306.2                              30

App.Br.25, as Defendants could have performed this work by itself for free. This is wrong.

As an initial matter, Plaintiffs fail to cite the relevant standard for finding costs "necessarily" incurred under Section 1920. As the district court noted, "[m]aterials and services are necessarily obtained and therefore taxable if they 'are ***reasonably*** necessary for use in the case, even if they are ultimately not used to dispose of the matter." 1.Fee.App.230 (emphasis added) (quoting *In re Williams*, 558 F.3d at 1148). This assessment, the court noted, is to be made without "benefit of hindsight." *Id.* Costs need only be reasonably necessary at the time incurred, not absolutely necessary.

Beyond this, Plaintiffs' argument why a third-party videographer was not "necessary" also runs afoul of the Federal Rules, and for that reason has been rejected by other courts. Plaintiffs claim that rather than use Veritext's Zoom-based platform, Defendants instead should have used Zoom's free-to-the-public services, which allow "free videography with the push of a button." App.Br.26. Ostensibly, Plaintiffs believe that, this way, Defendants could have recorded and preserved Mr. Sepi's video deposition for later trial use all by themselves, at zero cost, somehow going on and off the record as necessary.

Even assuming such a suggestion to be feasible, courts have rejected similar do-it-yourself proposals for recording video depositions as improper under the

15366306.2                                      31

Federal Rules, since doing this would skirt the requirement that neutral-third party officers oversee the recording of depositions, not parties or their own attorneys. *See* Fed. R. Civ. P. 28 and 30. As one such case considering video depositions held in 2020:

> [E]asy does not mean permissible, and Rule 30 has a specific process for taking a deposition that is to be certified under the rules, and for ensuring that a disinterested third-party, designated as a Rule 28 officer, affirms the accuracy of the recording and vouches for the integrity of the final result. That process cannot be so easily circumvented.

*Alcorn v. City of Chicago*, 336 F.R.D. 440, 445 (N.D. Ill. 2020). Other cases are in accord. *See Ryan v. eXp Realty LLC*, 2022 WL 475988, at *2 (D. Ariz. Feb. 16, 2022) (denying motion to use at trial deposition video recorded via Zoom without a certified videographer, despite the presence of a court reporter, including because "the video recording violates the Federal Rules"); *Raiser v. San Diego Cnty.*, 2021 WL 118901, at *5 (S.D. Cal. Jan. 13, 2021) (noting denial of plaintiff's request to self-record deposition video via Zoom due to conflict with Fed. R. Civ. P. 30, quoting *Alcorn*); *report and recommendation adopted*, 2021 WL 2886048 (S.D. Cal. July 9, 2021), *aff'd sub nom. Raiser v. Cnty. of San Diego*, 2023 WL 1813492 (9th Cir. Feb. 8, 2023).

There was thus no error or lack of rational basis when the district court found costs incurred for a third-party court reporting service to preserve the video transcript

of Mr. Sepi's two-day deposition to have been reasonably necessary. Plaintiffs offer no other basis for challenging the district court's reasoned conclusion, well within its discretion, that even in light of Mr. Sepi's asserted financial condition, the amount of costs being awarded in this action was "not unreasonably high." 1.Fee.App.233.

## CONCLUSION

Both of the district court's orders should be affirmed. The district court clearly did not abuse its broad discretion by awarding to Defendants some amount of their attorney's fees; nor did it abuse its discretion by awarding the challenged costs for Plaintiff Sepi's deposition.

DATED: May 3, 2023                    Respectfully submitted,

By: /s/ Robert H. Rotstein
Robert H. Rotstein (CA Bar # 72452)
  Admitted *Pro Hac Vice*
Emily F. Evitt (CA Bar # 261491)
  Admitted *Pro Hac Vice*
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
(310) 312-2000 – Telephone
(310) 312-3100 – Facsimile
rxr@msk.com
efe@msk.com

15366306.2                                   33

Mack J. Morgan, III (OBA #6397)
MJMLAW PLLC
6618 N. Hillcrest Ave.
Nichols Hills, OK 73116
(405) 343-7454 - Telephone
mack@mjmlaw.biz

*Attorneys for Defendants-Appellees
Netflix, Inc. and Royal Goode
Productions LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,169 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(A), and the typestyle requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Times New Roman 14-point.

I hereby certify, pursuant to 10th Cir. R. 25.5, that all required privacy redactions have been made. I further certify, pursuant to 10th Cir. R. 27.2 and ECF User Manual, Section II, Part J(b), that the hard copies of this Brief of Appellee to be submitted to Clerk's Office are exact copies of the electronic filing. I further certify that the electronic submission was scanned for viruses with the most recent version of Windows Defender and is free of viruses.

Dated: May 3, 2023                                  /s/ Robert H. Rotstein

15366306.2

35

**ATTACHMENT**

**Order Granting Defendants' Motion for Summary Judgment**

**(April 27, 2022)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

WHYTE MONKEE PRODUCTIONS,       )
LLC, and                        )
TIMOTHY SEPI,                   )
                                )
    Plaintiffs,         )
                                )
v.                              )       Case No. CIV-20-933-D
                                )
NETFLIX, INC., and              )
ROYAL GOODE PRODUCTIONS, LLC,   )
                                )
    Defendants.         )

**ORDER**

In March 2020, Defendant Netflix, Inc. released *Tiger King: Murder, Mayhem and Madness*, a seven-part documentary series that was produced by Defendant Royal Goode Productions, LLC. As anyone who has watched *Tiger King* can attest, its subtitle is not hyperbole. The series features several individuals who own tigers and other exotic animals, but mainly focuses on the Tiger King himself – Joe Exotic – and his acrimonious rivalry with self-styled animal activist Carol Baskin. The rivalry takes a turn for the worse, and by the end of the series, Exotic has been arrested for his involvement in a murder-for-hire plot directed at Ms. Baskin.

Included in the series at various points are short clips from eight videos filmed by Plaintiff Timothy Sepi and purportedly produced by Plaintiff Whyte Monkee Productions, LLC. With one exception, all the videos were filmed while Mr. Sepi was working at Exotic's home base – the Gerald Wayne Interactive Zoological Park. Following the release of *Tiger King*, Mr. Sepi registered the videos for copyright protection, either under his own

1

name or the name of Whyte Monkee Productions. Plaintiffs then sued Netflix and Royal

Goode for copyright infringement, contending that the videos were used without their

permission.

Defendants have moved for summary judgment [Doc. No. 46] on this claim, arguing

that seven of the videos are not owned by Plaintiffs because they were made within the

scope of Mr. Sepi's employment, and the remaining video is not subject to copyright

protection because it is lacking in originality. Alternatively, Defendants argue that their use

of the videos qualifies as a fair use such that no copyright infringement occurred. Plaintiffs

have responded in opposition [Doc. No. 55] and Defendants have replied [Doc. No. 56].

For the reasons explained below, the Court finds that Defendants are entitled to summary

judgment because seven of the videos are works for hire that are not owned by Plaintiffs,

and the use of the remaining video was a fair use.

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is

genuine if the facts and evidence are such that a reasonable juror could return a verdict for

either party. *Id*. All facts and reasonable inferences must be viewed in the light most

favorable to the nonmovant. *Id*.

A movant bears the initial burden of demonstrating the absence of a dispute of

material fact warranting summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–

2

23 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see also* Fed. R. Civ. P. 56(c)(1)(A). Although "[t]he court need consider only the cited materials," it may also "consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The key inquiry is whether the facts and evidence present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## UNDISPUTED MATERIAL FACTS

Joe Exotic, also known as Joseph Maldonado-Passage or Joseph Allen Schreibvogel, founded the Gerald Wayne Interactive Zoological Park in Wynnewood, Oklahoma. Defs.' Stmt. Undisp. Facts ¶ 1. The Park housed tigers, lions, and other exotic animals and was open to the public for tours. *See* Pls.' Br., Ex. 1 to Chaiklin Dec. [Doc. No. 46-26]. There was also a studio on park grounds, which was used to produce a web series called *Joe Exotic TV*. Def.'s Stmt. Undisp. Facts ¶¶ 2, 19. *Joe Exotic TV* was primarily an unscripted series featuring video footage from around the Park and skits invented by Exotic. *Id*.

In early 2015, *Joe Exotic TV* was produced by Rick Kirkham, who oversaw the studio operations and a team of four people. *Id*. at ¶ 4. In March 2015, Mr. Sepi was hired to work with Mr. Kirkham as a cameraperson. *Id.* at ¶ 5; Pls.' Add. Material Facts ¶ 54-55.

3

At the time of his hiring, Mr. Sepi understood that his job duties would include taking photographs of Park tours and working on *Joe Exotic TV*, that he would be paid $150 per week, and that he could live on Park property for free. Defs.' Stmt. Undisp. Facts ¶¶ 5-6; Pls.' Add. Material Facts ¶ 54-55. Although initially unclear about who was actually employing him, Mr. Sepi came to understand that he was working for the Park. Sepi Depo 2016 at 109:11-20 [Doc. No. 46-3]. Only a week after starting his employment, a fire destroyed the Park's studio and camera equipment. *Id.* at ¶¶ 10, 13. Mr. Kirkham and his crew promptly quit, and Mr. Sepi was left as the sole videographer at the Park. *Id.*

With the studio and camera equipment destroyed, *Joe Exotic TV* went on hiatus. *Id.* at ¶ 11. During this time, Mr. Sepi continued to photograph park tours and assisted with animal care around the Park. *Id.*; Pls.' Add. Material Facts ¶ 57. But this was only a temporary situation. Within a couple of months, a new production studio had been built, new camera equipment obtained, and *Joe Exotic TV* was back in production. Defs.' Stmt. Undisp. Facts ¶¶ 12-13. The new equipment was procured from Michael Sandlin, a *Joe Exotic TV* sponsor and the owner of a facility known as the Tiger Truck Stop. *Id.* at ¶ 12; Pls.' Add. Material Facts ¶ 63. Mr. Sepi did not make the arrangements to obtain the new equipment, but it was made available for his use. Defs.' Stmt. Undisp. Facts ¶ 12.

Using this new equipment, Mr. Sepi spent his workdays taking tour photographs, filming and editing *Joe Exotic TV*, filming campaign videos for Exotic (who ran for governor and president), filming music videos featuring Exotic, and filming the day-to-day operations of the Park. Defs.' Stmt. Undisp. Facts ¶ 17; Pls.' Response ¶ 17. Mr. Sepi filmed and produced the videos to provide publicity for the Park, to benefit Exotic, and to

4

promote the cause of the nonprofit that operated the Park. Defs.' Stmt. Undisp. Facts ¶¶ 24-26. Mr. Sepi admits that during this time frame, he was an employee of the Park, made $150 per week, lived rent-free on Park premises, and used the Park's studio and equipment, although he disputes that all the videography work he performed was done in the scope of his employment. Defs.' Stmt. Undisp. Facts ¶¶ 9,13; Pls.' Add. Material Facts ¶¶ 17, 63; Sepi Depo 2021 at 51:2-3 [Doc. No. 55-1].

Following the studio fire, *Joe Exotic TV* returned to streaming on May 7, 2015. Defs.' Stmt. Undisp. Facts ¶ 14. Each episode was preceded by a "disclaimer" stating that the footage is owned by Whyte Monkee Productions. Pls.' Add. Material Facts at ¶ 64. Whyte Monkee Productions is an Oklahoma limited liability company that was established on May 5, 2015. Defs.' Stmt. Undisp. Facts ¶ 16; Pls.' Add. Material Facts ¶ 59. The Articles of Organization include Exotic's email address, the Park's street address, and "Tim Sepi" as the signatory. Defs.' Stmt. Undisp. Facts ¶ 16. During the May 7th episode of *Joe Exotic TV*, Exotic referenced the newly formed Whyte Monkee Productions by stating "they can take a lot away from me, but they can't take my freedom of speech, and since this is all Whyte Monkee Productions and has nothing to do with us other than I'm the pretty face sittin' right here, I can say F--- you Carole Baskin." Pls.' Add. Material Facts ¶ 55.

Around February 2016, ownership of the Park was transferred to an entity owned by Jeffrey Lowe and it was renamed the Greater Wynnewood Exotic Animal Park. Defs.' Stmt. Undisp. Facts ¶ 28. Despite the change in ownership, Exotic continued to work as the Park's entertainment director and Mr. Sepi continued to film and produce videos

featuring Exotic. *Id.* at ¶¶ 28-30; Sepi Depo 2016 at 214:3-215:1. In August 2016, Mr. Sepi quit so that he could pursue his photography and get paid more than $150 per week. Sepi Depo 2016 at 189:6-13.

During and after Mr. Sepi's tenure at the Park, filmmakers associated with Defendant Royal Goode were shooting footage at the Park and editing what would eventually become the *Tiger King* series. Chaiklin Dec. ¶¶ 10-11. In addition to its own footage, Royal Goode licensed film clips from Exotic and Lowe, including the works that Plaintiffs now claim to own. Defs.' Stmt. Undisp. Facts ¶ 35. In January 2018, while creating *Tiger King*, one of the filmmakers emailed Mr. Sepi to obtain his assistance in accessing video footage that was apparently located at the Park. *Id.* at ¶ 36-38; Ex. 7 to Chaiklin Dec [Doc. No. 46-32]. Mr. Sepi responded by telling the filmmakers to contact Exotic because he did not work there anymore. *Id.* He did not assert any ownership interest in the footage at that time. *Id.*

*Tiger King* was released by Netflix in March 2020 and includes clips from the following videos that were filmed while Mr. Sepi was an employee of the Park:

- Disrespectful Tomato Thrower Trouble
- Joe-Getting Dragged by a Lion, Joe – Presidential PSA
- Mobile Trailer Inspections for Volunteers
- Country Music Artist Joe Exotic – Bring It On (Please Unite)
- Joe Exotic Country Music 'Here Kitty Kitty'
- Joe Exotic TV – Tornado on the Ground

*Id.* at ¶¶ 40-46. These seven videos were made during normal work hours using equipment loaned by Mr. Sandlin and edited (if at all) at the Park's studio. *Id.*

6

The remaining video – Travis MM Funeral Ceremony – was shot after Mr. Sepi terminated his relationship with the Park. *Id.* at ¶ 47. The video is approximately 23 minutes and 52 seconds long and documents the funeral of Exotic's husband, Travis Maldonado. *Id.* The video records guests arriving at the funeral, Exotic giving a eulogy, and the playing of a memorial video. The video was shot using a camera belonging to Mr. Sandlin and was livestreamed via the *Joe Exotic TV* YouTube channel, where it remained afterward. *Id.* Mr. Sepi shot the video by placing the camera on a tripod and leaving it running. *Id.* He did not edit the video, *id.*, but he did decide where to place the camera by figuring out the best viewpoint. Sepi Depo 2021 at 433:14-434:14. A clip from this video appears in a segment of *Tiger King* lasting approximately one minute and six seconds. The video is interspersed with other footage, including comments from Mr. Maldonado's mother that are critical of Exotic. Ex. 1 to Chaiklin Dec. at Ep. 5, 25:51.

Following the release of *Tiger King*, Mr. Sepi obtained copyright registrations for these eight videos. Pls.' Ex. 5-12 [Doc. Nos. 55-5 through 55-12]. Three of the videos are registered under Mr. Sepi's name and five of the videos are registered under Whyte Monkee Production's name. *Id.*

But the story does not stop there. Prior to Mr. Sepi's involvement with the Park, Carol Baskin – a big cat enthusiast and Exotic's nemesis – obtained a $1 million judgment against Exotic. Defs.' Stmt. Undisp. Facts ¶ 15. To collect this judgment, Ms. Baskin initiated garnishment proceedings against Exotic in Oklahoma. *Id.* The dispute between Exotic and Ms. Baskin was a bitter one, and it was an ongoing topic of discussion at the

7

Park during Mr. Sepi's employment. *See, e.g.,* Ex. 6 to Evitt Dec. [Doc. No. 46-6]; Sepi Depo 2021 at 160:16-22.

On September 13, 2016, approximately one month after leaving the Park, Mr. Sepi gave a deposition as a fact witness in connection with the garnishment proceedings. Defs.' Stmt. Undisp. Facts ¶ 31. At this deposition, Mr. Sepi testified extensively regarding his relationship with the Park and the creation of Whyte Monkee Productions. Most pertinent to this matter, he testified that Exotic hired him to be a "cameraman," his job duties would include "[t]aking still pictures and videoing whatever happens on the park," and he would be working, at least in part, on *Joe Exotic TV*. Sepi Depo 2016 at 73:3-77:25; 88:2-10. Mr. Sepi also testified that he was an employee of the Park, that his job responsibilities included videography, and that this work was performed in exchange for his $150 per week salary. *Id.* at 75:23-76:11; 76:24-77:4; 88:11-20; 96:11-17; 97:97-97:24; 109:4-17; 120:16-121:19; 129:3-133:8; 200:5-8. At that time, he believed that he had been fully compensated for the work he performed for the Park. *Id.* at 246:6-14.

With respect to Whyte Monkee Productions, Mr. Sepi made it abundantly clear at his 2016 deposition that he had nothing to do with the creation of this entity. He testified that he had "never seen" the LLC registration paperwork "before in his life," it was not his idea to create Whyte Monkee Productions, he did not know who came up with the idea, and he did not have access to the email account provided on the paperwork. *Id.* at 134:7-135:19-140:23, 141:8-11; 156:25-158:1. Further, although the name "Tim Sepi" was included as the signatory on the Articles of Organization filed with the Oklahoma Secretary of State, Mr. Sepi testified that he did not give permission for his name to be used and

would not have signed the paperwork using the name "Tim." *Id.* at 135:19-136:1; 140:3-23.

Mr. Sepi also testified that he had no control over Whyte Monkee Productions and did not believe he had any right to accounts owned by Whyte Monkee Productions. *Id.* at 158:5-8; 246:6-14. As to whether he thought Whyte Monkee Productions owned any rights to video footage from *Joe Exotic TV*, he was, at best, unclear on the issue. First, he testified that he thought Whyte Monkee Productions was "going to be the company that was used for Joe Exotic TV" but that he "didn't know" that it "would own anything from Joe Exotic TV." *Id.* at 136:2-137:2. He then reiterated that he did not know who owned the rights to *Joe Exotic TV*. *Id.* 137:17-19. However, later in his deposition, he testified that he believed that all video footage would be owned by Whyte Monkee Productions. *Id*. at 151:17-20. When asked again who owned the content, he responded "[f]rom what it looks like, me." *Id*. at 154:12-13.

Mr. Sepi's testimony on these points changed significantly by the time he filed this lawsuit. In 2021, he gave a deposition in connection with this matter where he directly contradicted his earlier testimony and admitted to committing perjury at his 2016 deposition. Specifically, at his 2021 deposition, Mr. Sepi testified that he came up with the idea to form Whyte Monkee Productions after the studio fire and gained permission from the Park's nonprofit to film videos using this entity. Sepi Depo 2021 at 43:2-14. The purpose of forming a separate entity, Mr. Sepi testified, was to protect the footage that he filmed and produced. *Id.* at 44:13-20. When confronted with the 2016 deposition testimony where he repeatedly denied knowing anything about the formation of Whyte Monkee

9

Productions, Mr. Sepi initially stated that he was "confused" because Whyte Monkee Productions "did not solicit or offer any services or get paid for anything." *Id.* at 105:14-106:15.

Mr. Sepi also testified at his 2021 deposition that he completed the paperwork to register Whyte Monkee as an LLC with the Oklahoma Secretary of State. *Id.* at 110:15-119:19. When confronted with his contradictory 2016 deposition testimony, Mr. Sepi first said he did not know why he answered the question that way. *Id.* at 106:16-109:18. He then responded that he denied ever seeing the registration paperwork because he completed the paperwork electronically. *Id.* When asked about his prior testimony indicating that he would not have used the name "Tim Sepi" on official paperwork, his explanation was that he "just said that." *Id.* at 113:1-114:8. When pressed further as to why he changed his testimony on this specific issue, Mr. Sepi said that he was "attempting to keep myself safe." *Id.* at 115:8-116:20. He explained that he did not know what Exotic was capable of doing, Exotic "thinks he owns it all," and he said whatever he could to "leave on good terms." *Id.* at 115:8-119:22. Later, Mr. Sepi testified that he "got involved with an individual who was an employee at the facility" that "had cats there that were under Joe's license" and he said whatever he could to keep on good terms to get the animals and himself safely out of the facility. *Id.* at 120:1-121:7.

When asked why he thought giving a truthful answer regarding Whyte Monkee Productions' formation would be harmful to him, Mr. Sepi said he did not have an answer and did not know why he thought that. *Id.* at 122:11-23:14. He was "nervous, scared, confused" and "feared for his life" but could not explain why lying about the formation of

Whyte Monkee Productions would somehow protect him. *Id.* at 128:20-129:19. Later in his deposition, he testified that he lied because if he didn't provide false testimony about Whyte Monkee Productions he would be locked out of the Park and would not be able to retrieve camera equipment and footage. *Id.* at 138:18-141:15. However, Mr. Sepi also admitted that there was not any reason why Exotic would not want Mr. Sepi to take copies of the footage. *Id.* at 147:21-148:4.

Prior to testifying that he lied at his 2016 deposition, Mr. Sepi initially testified that he had reviewed his 2016 deposition transcript and believed it was truthful. *Id.* at 116:17-20. After he admitted to committing perjury, he attempted to qualify this answer by explaining that he "didn't have time to go through everything" but he "reviewed enough" of the 2016 transcript and "just didn't get all the way to the bottom." *Id.* at 124:1-18. His answer then changed to "I've reviewed it" but "didn't read it" and "[r]eading and reviewing is two totally different things." *Id.*

In addition to the contradictions regarding Whyte Monkee Productions, Mr. Sepi also testified that he was being paid $150 per week for his photography work at the Park, which did not include any videography. *Id.* at 63:8-19; 85:7-10. He testified that when he described himself as a "cameraman" in his 2016 deposition, he did not properly elaborate to indicate that he only meant photography. *Id*. 29:20-31:7. He did not explain why any of his other 2016 statements describing his job duties at the Park were incorrect. *Id.*  Finally, at his 2021 deposition, Mr. Sepi admitted that he committed perjury when he testified in 2016 that Exotic hired him, but did not explain why he lied about this issue. *Id.* at 386:5-9.

11

## DISCUSSION

Plaintiffs' claim is straightforward: they assert that Defendants infringed their respective copyrights when they used clips from the eight videos in the *Tiger King* series without permission. To succeed on this claim, Plaintiffs must prove two elements: 1) ownership of a valid copyright and 2) unauthorized copying of original elements of the protected work. *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008). As to seven of the videos, Defendants argue that Plaintiffs cannot prove the first element because the videos are works for hire belonging to Mr. Sepi's employer. As to the remaining video, Defendants argue that Plaintiffs cannot prove the second element because the video lacks the required originality. Alternatively, Defendants argue that, even if Plaintiffs own a valid copyright, the use of the clips was fair use such that no copyright infringement occurred. Each of these issues is addressed in turn.

### A. Ownership and Originality

#### 1. Works for Hire

Although ownership "vests initially in the author or authors of the work," 17 U.S.C. § 201(a), the Copyright Act carves out an "an important exception" for works made for hire. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). If a work is made for hire, "the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17

12

U.S.C. § 201(b). The Copyright Act defines a work made for hire as one that is "prepared

by an employee within the scope of his or her employment."[1] *Id*. at § 101(1).

Defendants assert that seven of the eight videos involved in this litigation qualify as

works for hire because they were created while Mr. Sepi was an employee of the Park and

were made within the scope of his employment. Plaintiffs do not dispute that Mr. Sepi was

an employee of the Park but argue that his duties for the Park were separate from his

videography[2] services. The relevant inquiry, then, turns on whether the videos were made

within the scope of Mr. Sepi's employment for the Park. *U.S. Auto Parts Network, Inc. v.

Parts Geek, LLC*, 692 F.3d 1009, 1018 (9th Cir. 2012) (addressing only scope of

employment because it was undisputed that alleged copyright owner was employee); *Avtec

Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) (same); *Fleurimond v. New York

Univ.*, 876 F. Supp. 2d 190, 199 (E.D.N.Y. 2012) (same).

Because the Copyright Act does not define when a work is created within the scope

of employment, "common-law agency principles govern resolution of that question."

*Peiffer*, 21 F.3d at 571 (quoting *Reid*, 490 U.S. at 739-40). Accordingly, numerous courts

have adopted the three-prong test expressed in Section 228 of the Restatement (Second) of

Agency in determining whether a work was made within the scope of employment. *See,*

---

[1] A work made for hire is also defined to include "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. §101(2). The parties do not contend that this provision is applicable.

[2] As used here, the term "videography" encompasses filming and editing work.

*e.g., U.S. Auto Parts*, 692 F.3d at 1015; *Peiffer*, 21 F.3d at 571; *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 186 (2d Cir. 2004); *Sterpetti v. E-Brands Acquisition, LLC,* No. 6:04-CV-1843-ORL-3DA, 2006 WL 1046949, at *5 (M.D. Fla. Apr. 20, 2006); *Fleurimond*, 876 F. Supp. 2d at 199. Section 228 provides that conduct of a servant is within the scope of employment if "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228(1) (1958).[3] As explained below, Mr. Sepi's conduct meets each of these three elements.

---

[3] The parties rely on the formulation of "scope of employment" articulated in § 228 of the Restatement (Second) of Agency in their analysis, as opposed to the more recent version articulated in § 7.07 of the Restatement (Third) of Agency. The Restatement (Third) of Agency provides that

> [a]n employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

Restatement (Third) Of Agency § 7.07(2) (2006). The comments to this section indicate that, as compared to the definition used in the Restatement (Second) of Agency, this formulation is "phrased in more general terms" and designed to accommodate "contemporary workforces" where employees may not be "situated on the employer's premises nor continuously or exclusively engaged in performing assigned work." *Id.* at cmt. b. Because the parties rely on the formulation contained in the Restatement (Second) of Agency, the Court has also structured its analysis using this formulation. Opinions post-dating the publication of the Restatement (Third) of Agency have similarly relied on the Restatement (Second) of Agency's three-part formulation when analyzing whether a work was made for hire under the Copyright Act. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 277 (3d Cir. 2019); *U.S. Auto Parts*, 692 F.3d at 1015; *Fleurimond*, 876 F. Supp. 2d at 199. However, regardless of which definition is used, the Court would reach the same result.

14

a.   *Whether the conduct was "of the kind" the servant was employed to perform.*

At his 2016 deposition, Mr. Sepi testified – unequivocally – that he was hired to perform videography work which would include, at least in part, producing videos for *Joe Exotic TV*. He further testified that he eventually came to understand that he was working for the Park and that he filmed and produced videos featuring Exotic in exchange for his $150 per week salary from the Park. Although Mr. Sepi's ability to perform the full range of his job duties was temporarily halted when the Park's studio was destroyed, he was still employed as a videographer and he resumed performing these duties once the studio was rebuilt. As to Whyte Monkee Productions, Mr. Sepi testified that he neither created nor controlled it. This testimony is fatal to his copyright infringement claim – no reasonable juror could interpret the 2016 testimony as establishing anything other than Mr. Sepi's admission that he was a Park employee who was performing videography work within the scope of his employment.

But Mr. Sepi's testimony has changed. According to his 2021 deposition testimony, he was hired solely to perform photography services and he personally conceived of and set up Whyte Monkee Productions as a separate venture for his videography work. Mr. Sepi does not attribute this drastic change in testimony to a failure of memory or confusion, but to a brazen act of perjury. He contends that the testimony he provided in 2016 (which is now unfavorable to him) was simply a lie. Unsurprisingly, Defendants argue that the 2021 testimony should be excluded under the sham affidavit doctrine.

15

The sham affidavit doctrine provides that an affidavit conflicting with the affiant's prior sworn statements should be disregarded when "it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). The policy underlying this rule is obvious: "the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Id.* Although the rule is typically applied to affidavits submitted during summary judgment briefing, it has also been applied to preclude corrections on a deposition errata sheet, *Burns v. Bd. of Cty. Comm'rs of Jackson Cty.*, 330 F.3d 1275, 1282 (10th Cir. 2003), and later deposition testimony that contradicts an earlier sworn statement. *Martinez v. Barnhart*, 177 F. App'x 796, 800 (10th Cir. 2006) (unpublished); *Essick v. Yellow Freight Sys., Inc.,* 965 F.2d 334, 336 (7th Cir. 1992). "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks*, 796 F.2d at 127.

Although Mr. Sepi was not represented by a lawyer during his 2016 deposition or cross-examined in the traditional sense, he did have access to the pertinent evidence and his responses reflected no confusion regarding either the job he was employed to perform or his lack of involvement in the formation or operation of Whyte Monkee Productions. Moreover, the inconsistencies in his testimony are not slight variations affecting only the weight of the evidence, but direct contradictions on issues that are dispositive of his claims.

Still, there *might* be a case for not excluding the later testimony as a sham had Mr. Sepi

provided a rational explanation for lying under oath. But he did not.

Start with the testimony regarding his job responsibilities. At his 2021 deposition,

Mr. Sepi stated that he was paid by the Park only for his photography work, that he was

not hired by Exotic, and that he was hired only as a photographer.[4] Sepi Depo 2021 at 63:8-

19; 85:7-10; 386:5-9. These statements plainly contradict his 2016 testimony, where he

stated that Exotic hired him, he was hired to work partly on *Joe Exotic TV*, and that his

Park salary included videography work.[5] Sepi Depo 2016 at 74:9-76:11. His only attempted

explanation for these contradictions is that when he used the word "cameraperson" in his

2016 deposition to describe what Exotic hired him to do, he did not properly specify that

he meant only still photography. *Id.* at 29:20-31:10. But Mr. Sepi demonstrated no

confusion at his 2016 deposition regarding the duties of a cameraman and even explained

that "[c]ameraman can mean still or video." Sepi Depo 2016 at 88:8-10. In any event, Mr.

Sepi's subsequent clarification of his testimony goes to a single question and fails to

---

[4] Although Mr. Sepi testified in 2021 that he was hired only as a photographer, Plaintiffs' response brief states otherwise. Plaintiffs' Statement of Additional Material Facts admits that Mr. Sepi was hired – not as a photographer taking still photos of park tours – but as a cameraman on *Joe Exotic TV* for $150 per week. The inconsistency between Mr. Sepi's 2021 testimony and the admissions made in Plaintiffs' brief further supports the Court's conclusion that Mr. Sepi's 2021 testimony is designed to create a sham issue of fact.

[5] Plaintiffs argue that this testimony describes only what Mr. Sepi was hired to do, and not what his job responsibilities were following the studio fire. Pls.' Br. at 14. However, as Defendants point out in their reply brief, this is a tortured reading of Mr. Sepi's 2016 testimony. Mr. Sepi's 2016 testimony indicates that he worked for the Park as a videographer even after the studio was rebuilt. *See, e.g.* Sepi Depo 2016 at 97:9-98:14; 120:20-121:13.

address the other statements he made in 2016 indicating that he was filming and producing videos as part of his employment for the Park.

With respect to his testimony regarding the formation of Whyte Monkee Productions, Mr. Sepi could not provide a consistent explanation as to why he lied. At the outset of his 2021 deposition, he indicated that he reviewed his 2016 testimony and believed it to be truthful. When confronted with his 2016 testimony indicating that he did not know why Whyte Monkee Productions was created, he first stated that he was "confused" by what he was being asked because Whyte Monkee Productions "did not solicit or offer any services or get paid for anything." Sepi Depo 2021 at 105:14-106:15. He did not explain how these features would cause confusion when responding to a question as straightforward as "Do you know why it was created at that time, what the purpose was?" Sepi Depo 2016 at 104:9-11.

Similarly, when Mr. Sepi was confronted with his 2016 testimony indicating he had never seen the LLC paperwork for Whyte Monkee Productions, Mr. Sepi first stated that he did not know why he answered the question that way. He quickly changed tack and asserted that he said he had not seen the paperwork before because it was filed electronically. If that is true, it represents an unreasonably narrow interpretation of the deposition question and an inappropriately evasive response. Moreover, his explanation does not account for the testimony directly surrounding his response, where he acknowledged that the paperwork was obtained from a state website, that the paperwork submission date had no significance to him, and that he did not know how Whyte Monkee Productions came to be created. *Id.* at 134:7-136:15.

18

Mr. Sepi's explanation for committing perjury in 2016 continued to evolve as his deposition went on. When asked why he stated in 2016 that he would not have signed the LLC paperwork using the name "Tim," he said he "probably just said that." *Id.* at 112:20-114:8. Eventually, he explained that he lied because he feared for his life and wanted to keep on good terms with Exotic.[6] *Id.* at 115:8-122:22. He then elaborated that he "got involved with an individual who was an employee at the facility" that "had cats there that were under Joe's license" and he said whatever he could to keep on good terms to get the animals and himself safely out of the facility. *Id.* At another point in his 2021 deposition, he testified that he lied because if he didn't provide false testimony he would be locked out of the Park and would not be able to acquire camera equipment and footage. *Id.* at 140:9-141:15. But when asked why he thought giving a truthful answer regarding Whyte Monkee Productions' formation would be harmful to him, Mr. Sepi said he did not have an answer and did not know why he thought that. *Id.* at 122:11-23:14.

Ultimately, Mr. Sepi's 2021 testimony regarding his job responsibilities and the formation of Whyte Monkee directly contradicts his earlier sworn testimony and he has failed to offer a rational or consistent explanation for the contradictions. Because the testimony is in direct conflict and the contradictions are not the result of confusion, a failure

---

[6] It must be noted that this explanation makes no sense. The 2016 testimony was given in connection with the garnishment proceeding initiated by Exotic's rival, Carol Baskin, in an attempt to collect on her $1 million judgment. Mr. Sepi's 2016 testimony disclaiming knowledge of Whyte Monkee Production's creation and denying he had the ability to control its accounts *hurt* Exotic's interests with respect to the garnishment and would presumably not be what a person would say if they wanted to keep on good terms with Exotic.

19

of memory, or newly discovered evidence, Mr. Sepi's 2021 testimony is appropriately excluded as a transparent attempt to create a sham issue of fact. *See Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1017 (10th Cir. 2002) (excluding affidavit that contradicted deposition testimony because nothing in deposition questions suggested deponent should limit his answers to particular meetings or conversation); *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 973 (10th Cir. 2001) (excluding defendant's affidavit that came into existence a year and half after deposition, directly contradicted earlier testimony, and which was detrimental to plaintiff's sole remaining cause of action); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.,* 131 F.3d 874, 894 (10th Cir. 1997) (excluding affidavit that specified key information where earlier deposition testimony responses were "probably not" and "I don't know"); *Barber v. Hallmark Cards, Inc.,* 74 F.3d 1248 (10th Cir. 1996) (unpublished) (excluding affidavit that directly contradicted deposition testimony because testimony was unequivocal and did not reflect confusion); *Rios v. Bigler,* 67 F.3d 1543, 1551 (10th Cir. 1995) (excluding affidavit testimony because deposition was unequivocal and deponent had access to relevant materials); *Franks,* 796 F.2d at 1237 (excluding affidavit that directly contradicted prior sworn testimony). No other result is warranted – litigants cannot be permitted to create a fact issue by simply dismissing as a lie prior sworn testimony that no longer serves their purpose, particularly when they cannot offer anything other than a nonsensical, inconsistent explanation for their actions.

Without Mr. Sepi's 2021 testimony to rely on, the only other evidence Plaintiffs offer is an unnotarized declaration from former Park manager John Reinke stating that

20

"Sepi was hired as the parks [sic] photographer for zoo tours and graphic designer"[7] and

"[s]eperate from employment duties at the Zoo, Sepi produced content for the Joe Exotic

TV YouTube channel under Whyte Monkee Productions LLC." Ex. 4 to Pls. Br.

Defendants object to the admissibility of this declaration as running afoul of Fed. R. Civ.

P. 56(c)(4) because it is not made on personal knowledge and does not show that Mr.

Reinke is competent to testify on these matters. However, Rule 56(c)'s requirements of

personal knowledge and competence may be inferred if it is clear from the context of the

affidavit that the affiant is testifying from personal knowledge. *Told v. Tig Premier Ins.

Co.*, 149 F. App'x 722, 725 (10th Cir. 2005) (unpublished). Construing the evidence in the

light most favorable to Plaintiffs, it can reasonably be inferred that the park manager, who

worked at the park during the duration of Mr. Sepi's employment, would have at least some

personal knowledge of Mr. Sepi's job responsibilities.

However, to establish a fact for summary judgment purposes, an "affidavit must set

forth facts, not conclusory statements." *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194

F.3d 1089, 1101 (10th Cir. 1999). Mr. Reinke's declaration provides only a conclusory

statement that Mr. Sepi's videography work was a separate enterprise for Whyte Monkee

Productions and fails to include any facts indicating how he came to know of this

arrangement, the details of the arrangement, or the purpose of the arrangement. Mr.

Reinke's affidavit is therefore insufficient to create a factual dispute on this issue. *Lantec,

Inc.*, 306 F.3d at 1019 (refusing to consider verified complaint on summary judgment

---

[7] Mr. Reinke's statement is contradicted by Plaintiffs' brief which states that Mr. Sepi was
hired to work as a cameraman on *Joe Exotic TV*.

because it "did little more than state a legal conclusion" and failed to include details regarding an alleged oral contract); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 856 n. 9 (10th Cir. 1999) (finding affidavit submitted on summary judgment "unpersuasive because much of it is conclusory, vague, and/or lacking in foundation" and fails to include details regarding alleged agreement).

In any event, even crediting Mr. Sepi's 2021 testimony, videography is sufficiently related to photography to be considered "of the kind" of work Mr. Sepi was employed to perform. Mr. Sepi testified in 2021 that after the studio was destroyed, he was working for the Park "doing photography for the tours," "doing marketing photos," and "doing audio in the gift shop and the audio at the stage area." Sepi Depo 2021 at 57:10-18. This type of work – photography, audio set up, and marketing – is similar in kind to the videography work Mr. Sepi was also performing. Indeed, as even Mr. Sepi admits, photography and videography involve overlapping skills, both fall under the umbrella of camera operation, and both involved promotion of the Park. Sepi Depo 2021 at 212:16-21. The videography work, then, is more aptly described as an expansion of the photography work Mr. Sepi was already performing for the Park rather than a departure from that work, and as such, it falls within the scope of his employment. *See Fleurimond,* 876 F. Supp. 2d at 204 (artistic creation of mascot for university within scope of employment for graphic designer employed to create seals, signs, and banners for university website); Restatement (Third) of Agency §7.07(2) cmt b (describing work as outside the scope of employment where it "represents a departure from, not an escalation of, conduct involved in performing assigned work or other conduct that an employer permits or controls.").

22

Plaintiffs respond that – perjured statements aside – Mr. Sepi testified consistently in 2016 that he believed Whyte Monkee Productions owned the rights to the footage produced under its name. But the relevant inquiry is whether an employee's conduct in creating the work was "of the kind" he was employed to perform, not whether the employee believed he owned the work or wished to keep it separate. Moreover, material created separate from an employee's normal responsibilities can still fall within the scope of employment if its creation is incidental to an employee's job duties and within the ultimate objective of the principal. *See Genzmer v. Pub. Health Tr. of Miami-Dade Cty.,* 219 F. Supp. 2d 1275, 1281 (S.D. Fla. 2002) (creation of computer program by doctor undertaking research project within scope of employment); *Vanderhurst v. Colorado Mountain Coll. Dist.*, 16 F. Supp. 2d 1297, 1307 (D. Colo. 1998) (outline created by teacher on his own time and with own materials was a work for hire); *Miller v. CP Chemicals, Inc.*, 808 F. Supp. 1238, 1243-44 (D.S.C. 1992) (creation of computer program by lab supervisor on his own time and with own materials was a work for hire). Videography of the Park and Exotic (the Park's entertainment director) was incidental to Mr. Sepi's employment as Park photography and, importantly, both tasks were within the Park's objective of promoting its activities. Mr. Sepi's videography work was therefore "of the kind" Mr. Sepi was employed to perform.

Finally, the fact that Mr. Sepi and Exotic (or anyone else at the Park) may have orally agreed to define Mr. Sepi's work as separate from his Park duties is not sufficient to place the conduct outside the scope of employment or to vary the ownership rights of a work made for hire. 17 U.S.C. § 201(b) (requiring signed, written instrument to vary

23

ownership rights); *Fleurimond*, 876 F. Supp. 2d at 207-208 ("Moreover, to the extent the parties may have orally agreed to define the Plaintiff's work as one outside the scope of her employment, such an agreement is non-enforceable under the Copyright Act."). The same is true with respect to the formation of a limited liability company. Where an employee creates a work within the scope of employment, a work does not cease to be a work made for hire simply because the employee creates a separate entity. As Mr. Sepi was acting within the scope of his employment for the Park, the videos are works for hire with authorship vesting in the Park. Had the involved parties wished for authorship to vest in Whyte Monkee Productions or in Mr. Sepi individually, they should have executed a written agreement pursuant to 17 U.S.C. § 201(b).

Accordingly, Defendants have met their burden of demonstrating that there is no genuine dispute that Mr. Sepi's videography work was of the kind he was employed to perform.

> b. *Whether the work occurred substantially within the authorized time and space limits.*

Having satisfied the first element for demonstrating that the videos were created within the scope of employment, Defendants must still prove the two remaining elements. The second element requires proof that the employee's conduct occurred substantially within the authorized time and space limits. Plaintiffs offer no specific argument in response to Defendants' assertion that this element is satisfied. The undisputed facts show that Mr. Sepi split his workday between photography, filming, and editing, that the videos were filmed on or near Park premises, that he completed at least some of this work at a

studio on Park premises, and that he used at least some camera and computer equipment that was procured by someone at the Park for his use. Defendants have therefore met their burden of establishing that the work occurred substantially, if not entirely, within the authorized time and space limits.

> c. *Whether the work was actuated, at least in part, by a purpose to serve the employer.*

Finally, Defendants must show that Mr. Sepi's conduct in creating the videos was actuated, at least in part, by a purpose to serve the Park. Plaintiffs do not dispute that Mr. Sepi filmed the videos "to provide publicity for the Zoo" and to make Exotic look good. Thus, even if part of Mr. Sepi's motivation was to eventually license the footage or otherwise use it for his own purposes, his work was at least partly actuated by a desire to serve the Park.

Accordingly, viewing the evidence in the light most favorable to Plaintiffs, and considering the record as a whole, no reasonable juror could conclude that the seven videos at issue were created outside the scope of Mr. Sepi's employment for the Park. The videos therefore qualify as works for hire under § 201(b) of the Copyright Act, and Mr. Sepi's employer[8] is the author of the works.

### 2. Originality

The sole remaining video at issue is titled Travis MM Funeral Ceremony and was filmed after Mr. Sepi ended his employment with the Park. Defendants argue that this video

---

[8] Whether that be the Gerald Wayne Interactive Zoological Park, the Greater Wynnewood Zoological Park, or some other entity is not relevant. All that matters for purposes of this litigation is that the works are not owned by Mr. Sepi or Whyte Monkee.

is not subject to copyright protection because it lacks originality. In support of this argument, Defendants rely on *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008), where the Tenth Circuit explained that "not every work of authorship, let alone every aspect of every work of authorship, is protectable in copyright; only original expressions are protected." An original expression is one that is "'independently created by the author (as opposed to copied from other works).'" *Id.* at 1263 (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)). With respect to a medium like photography, a photograph is subject to copyright to the extent it "reflects the photographer's decisions regarding pose, positioning, background, lighting, shading, and the like." *Id.* at 1264. Applying these principles, the Tenth Circuit in *Meshwerks* held that digital models of Toyota vehicles that were developed to be used on Toyota's website were not original, and therefore not copyrightable, because they were unadorned copies that did not involve making any decisions regarding lighting, shading, angle, and so on. *Id.* at 1265-66.

The same cannot be said here. Mr. Sepi admits that the video was filmed using a tripod and was unedited, but he also testified that he decided where to place the camera by figuring out the best viewpoint. The video itself shows the camera zooming in and out several times and panning around the scene, further suggesting that Mr. Sepi made at least some intentional decisions regarding angle, focus, and what to film. Just as these elements are sufficient to make a photograph of a real world object copyrightable, they are sufficient to make a video of a real world event copyrightable. *See Feist*, 499 U.S. at 1289 ("Thus, even a directory that contains absolutely no protectible written expression, only facts,

26

meets the constitutional minimum for copyright protection if it features an original selection or arrangement."). And, unlike in *Meshworks*, 528 F.3d at 1264, where the models were "not so much independent creations as (very good) copies of Toyota's vehicles," this video is not a copy of another work but an independent creation. Thus, construing the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that the Travis MM Funeral Ceremony video contains elements of originality that are subject to copyright.

Because there is at least a factual dispute as to the originality of the video, and the video is not a work for hire, it is necessary to evaluate Defendants' alternative argument – that their use of the video in *Tiger King* was a fair use that did not infringe Mr. Sepi's copyright.

## B. Fair Use

Under § 107 of the Copyright Act, "a copyright holder cannot prevent another person from making a 'fair use' of copyrighted material." *Google LLC v. Oracle Am., Inc.*, __ U.S. __, 141 S. Ct. 1183, 1196 (2021). This doctrine embodies "an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Id.* (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). The Copyright Act sets out four nonexclusive factors that courts must consider in determining whether the use of a protected work is a fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

27

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. When evaluating fair use, all of these factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). "Although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

Defendants contend that, applying the four factors outline in the Copyright Act, their use of all eight videos qualifies as a fair use. However, because seven of the videos are works for hire with authorship vesting in Mr. Sepi's employer, it is only necessary to determine whether Defendants' use of the remaining video – Travis MM Funeral Ceremony – was a fair use. *See PDK Lab'ys Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("[I]f it is not necessary to decide more, it is necessary not to decide more.").

### 1. Purpose and Character of the Use

The first factor concerns "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Where a defendant's use of a protected work qualifies as "criticism, comment, news reporting, teaching…scholarship, or research," there is a strong presumption that this

28

factor favors the defendant. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004). But the core of this inquiry is "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (internal citation and quotation marks omitted) (alteration in original). Put another way, this factor asks "whether and to what extent the new work is 'transformative.'" *Id.* "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*

The parties have very different views of the *Tiger King* series. Defendants describe it as a documentary providing criticism and commentary on Exotic's behavior, roadside zoos, and contemporary society, whereas Plaintiffs liken it to a reality show that serves only to entertain. But under either categorization, there can be no dispute that Defendants' use of the Travis MM Funeral Ceremony video serves a different purpose than the one Mr. Sepi intended.

At his 2021 deposition, Mr. Sepi testified that he created the video "[f]or remembrance" and that it was livestreamed on YouTube without any editing, where it remained afterward. Sepi Depo 2021 at 425:19-21. Defendants' use and purpose is decidedly different – they have excised a relatively small portion of the video, interspersed it with comments from Mr. Maldonado's mother that are critical of Exotic, and woven it into the larger narrative of the series. Thus, whether for entertainment value, cultural commentary, or both, Defendants have imbued the original video with a different character

29

and altered its message. Rather than "merely repackage[ing] or republish[ing]" the Travis MM Funeral Ceremony video, Defendants have used it as "raw material" to create "new information, new aesthetics, new insights and understandings." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013) (quotation omitted). Their use is therefore transformative, and this factor weighs in favor of fair use. *See Bill Graham Archives*, 448 F.3d at 609-610 (use of copyrighted images in biography accompanied by commentary and when standing alone was transformative because it was "plainly different from the original purpose for which [the images] were created."); *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (use of clip of the Four Seasons performance on *The Ed Sullivan Show* in a musical about the Four Seasons was transformative because it was used as a "biographical anchor" rather than "for its own entertainment value"); *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 984 (N.D. Ill. 2019) (football documentary's use of clip of *Super Bowl Shuffle* song was transformative because the song was "not serving its original function of entertainment in the film.").

The commercial nature of *Tiger King* does not undermine this conclusion. The clips from the Travis MM Funeral Ceremony video comprise a tiny fraction of the series and are not themselves exploited for commercial gain. *Seltzer*, 725 F.3d at 1178 (finding that use of copyrighted image at concert was only incidentally commercial because it was never used to market concert or merchandise). Additionally, "[w]hen the defendant does not merely duplicate and copy verbatim the original in its entirety, pecuniary gain is largely a non-issue." *Red Label Music Publ'g, Inc*, 388 F. Supp. 3d at 985 (citing Campbell, 510 U.S. at 591).

### 2.   Nature of the Copyrighted Work

The second factor in the fair use inquiry – the nature of the copyrighted work – recognizes that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Generally, the law "recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 563 (1985). Whether a work has been published is also critical to its nature: "the scope of fair use is narrower with respect to unpublished works" but "even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public." *Id.* 563.

Although perhaps possessing some elements of originality with respect to angle, lighting, and framing, the Travis MM Funeral Ceremony video is not a work of fiction or artistry. The video is more factual than creative, which tips the scales slightly in favor of fair use. More important, however, is that the video was previously published – it was livestreamed via YouTube and remained there afterwards – and Defendants' use of a few select clips therefore did not infringe Mr. Sepi's "right to control the first expression" of the work. *Id.*; *see also Seltzer*, 725 F.3d at 1178. This factor therefore also weighs in favor of fair use.

### 3.   Amount and Substantiality of the Portion Used

The third factor concerns the amount and substantiality of the portion used and is reviewed "with reference to the copyrighted work, not the infringing work." *Bill Graham*

*Archives*, 448 F.3d at 613. This factor requires courts to consider not only "the quantity of the materials used," but also "their quality and importance." *Campbell*, 510 U.S. at 587. So long as "the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003).

The portions of the video used by Defendants show Exotic speaking at the funeral. Qualitatively, these clips are some of the more unusual portions of the video, although they are not necessarily the most important. The comments by Mr. Maldonado's mother, for example, may be just as significant as the comments by Exotic to a person wanting to view the funeral. Quantitatively, only a tiny portion of the Travis MM Funeral Ceremony video is featured in *Tiger King*. Because Defendants' use of the video comprises a small portion of the original, this factor weighs in favor of fair use.

### 4. Effect on the Potential Market for or Value of the Work

The final factor "asks what effect the allegedly infringing use has on the 'potential market for or value of the copyrighted work.'" *Seltzer*, 725 F.3d at 1179 (quoting 17 U.S.C. § 107(4). This factor requires consideration of "the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant...would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotation omitted). When "a commercial use amounts to mere duplication of the entirety of an original" and "serves as a market replacement," it is more likely that "cognizable market harm to the original will occur." *Id.* at 591. Conversely, when "the second use is

transformative, market substitution is at least less certain, and market harm may not be so readily inferred." *Id.*

*Tiger King* is not a substitute for the Travis MM Funeral Ceremony video. It is not likely that a person interested in viewing the funeral would consider viewing *Tiger King* as a replacement. Given that Mr. Sepi filmed this particular video as a means of remembering his friend, and not as a creative or entertainment venture, Defendants' use of the video has therefore not usurped any primary market for the work. *SOFA Ent., Inc.,* 709 F.3d at 1280 (no market harm where second work was not a substitute for the original); *Bill Graham Archives*, 448 F.3d at 614 (transformative work did not cause market harm). Further, to the extent Mr. Sepi intends to license the video or certain clips, the portions featured in *Tiger King* are "too few, too short, and too small in relation to the whole" to undercut any market for this material. *Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 495 (S.D.N.Y. 1996). Potential purchasers of the Travis MM Funeral Ceremony video or clips from this video are unlikely to purchase that material from Defendants, as opposed to Plaintiffs, and Defendants' use of the video will therefore have a minimal effect on any potential markets or the value of this work. *Red Label Music Publishing, Inc.*, 388 F. Supp. 3d at 898.

In sum, each of the four statutory factors favors a finding that Defendants' use of portions of the Travis MM Funeral Ceremony video was a fair use. Considering these factors together, and mindful that copyright aims to both "secure a fair return for an 'author's' creative labor" and "stimulate artistic creativity for the general public good,"

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975), Defendant's use of the

Travis MM Funeral Ceremony video was fair use.

### CONCLUSION

For the reasons stated above, the court finds that Defendants are entitled to summary

judgment on Plaintiffs' copyright infringement claim.

**IT IS THEREFORE ORDERED** that Defendants Netflix, Inc. and Royal Goode

Productions LLC's Motion for Summary Judgment [Doc. No. 46] is **GRANTED**.

**IT IS SO ORDERED** this 27th day of April, 2022.

_____

TIMOTHY D. DeGIUSTI
Chief United States District Judge

34

# CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that counsel for all parties are registered CM/ECF users and that service to Plaintiffs-Appellants will be accomplished by the CM/ECF system.

/s/ Robert H. Rotstein

15366306.2